FRANSON, J.,
Concurring and Dissenting.—I concur in all parts of the disposition in the lead opinion and agree with its resolution of some of the legal questions presented. I write separately to identify the legal issues that I have resolved differently and the points on which I agree.
This appeal addresses the controversial issue of off-reservation casinos[1] and whether the Governor of California has the authority to approve off-reservation gambling on previously nontribal lands. The specific question of California law is whether the Governor has the constitutional authority to concur in the Secretary’s determination under IGRA that a proposed off-reservation casino “would be in the best interest of the Indian tribe and its members” and “would not be detrimental to the surrounding community,” thereby allowing off-reservation gambling. (25 U.S.C. § 2719(b)(1)(A).) The answer to this question requires us to interpret Proposition 1A, which the voters passed in November 2000 to modify the California Constitution’s prohibition of casinos.
My approach to interpreting voter initiatives that amend the California Constitution is simple. The initiative process functions best when voters are (1) informed that the initiative addresses a controversial issue with a wide range of impacts for Californians and (2) told how the initiative resolves that controversial issue. When voters are so informed, courts can “give effect to *723 the voters’ formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote.” (Ross v. RagingWire Telecommunications, Inc. (2008) 42 Cal.4th 920, 930 [70 Cal.Rptr.3d 382, 174 P.3d 200] (RagingWire).) Furthermore, when the voter initiative creates a specific exception to a general constitutional prohibition, the exception should not be expanded and the prohibition reduced to allow an activity on which the electorate was not asked to vote.
Using this approach to interpret Proposition 1A leads to the conclusion that it does not authorize the Governor to concur. First, the text of Proposition 1A plainly omits any power to concur in the Secretary’s two-part determination and, thus, does not include a formally expressed intent to grant such a power. Second, an implied grant of that power is not ‘“necessary” under the principles of California law that define when an implication is necessary. Third, the wording of Proposition 1A and the materials in the ballot pamphlet did not inform the average voter that approving the constitutional amendment would grant the Governor the power to concur or, more generally, would grant the Governor authority to veto or approve a proposed off-reservation casino.
In sum, expanding Indian gaming to off-reservation locations was and is a controversial issue of public policy with a wide range of consequences for Californians. It is implausible that the average voter would have understood the controversy was being resolved by an undisclosed, implied grant of the authority to concur. Simply put, there is absolutely nothing of substance in the historical record, the language or history of Proposition 1A, or the ballot materials to show that the electors were asked to vote on a grant of the authority to concur.
Therefore, plaintiffs stated a cause of action on the ground the Governor has no authority to concur in a federal two-part determination relating to an off-reservation casino. I concur in the reversal of the judgment of dismissal and the conclusion that plaintiffs have stated a cause of action for a writ of mandate to set the concurrence aside on the ground that it is unsupported by legal authority. My interpretation of Proposition 1A also results in the conclusion that plaintiffs have stated a cause of action for declaratory relief stating the concurrence was void ah initio.
PROCEEDINGS
The procedural history that led to the judgment of dismissal challenged in this appeal is described in the lead opinion. The main issue raised in this appeal relates to the Governor’s concurrence power. The trial court decided an implied concurrence power existed and the initial briefing in this appeal *724 addressed whether an implied concurrence power was granted by Proposition 1A. Accordingly, this opinion addresses whether an implied concurrence power exists.[2]
DISCUSSION
I. Historical Context for Proposition 1A
Ascertaining the meaning of a voter initiative such as Proposition 1A requires an examination of the words and grammar of the initiative, along with the history of the initiative placed in the wider historical circumstances of its enactment. (B.H. v. County of San Bernardino (2015) 62 Cal.4th 168, 190 [195 Cal.Rptr.3d 220, 361 P.3d 319] [wider historical circumstances]; People v. Manzo (2012) 53 Cal.4th 880, 886 [138 Cal.Rptr.3d 16, 270 P.3d 711] [history and background of provision]; see pt. III.B.3., post.) The wider historical circumstances for the adoption of Proposition 1A in 2000 include events that defined the United States’s approach to the sovereignty of tribal lands and, more recently, the regulation of Indian gaming by federal, state and tribal governments.
A. Federal Constitution and Sovereignty
1. Federal Constitution
Policies, legislation and litigation involving the possession of Indian land and the regulation of activity on that land predates the American Revolution. (See generally Worthen & Fransworth, Who Will Control the Future of Indian Gaming? “A Few Pages of History Are Worth a Volume of Logic” (1996) 1996 B.Y.U. L.Rev. 407, 412-417 (Worthen).) I pick up the historical trail at the Constitutional Convention, which considered the question of whether states should have the authority to enter into treaties and wars with Indians. (Id. at p. 419.) The convention did not produce a clear definition of the roles held by the federal government and the state governments in matters involving Indian tribes. Instead, the United States Constitution provides that Congress shall have the power ‘“[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.” (U.S. Const., art. I, § 8, cl. 3.) This provision is referred to as the Indian commerce clause. (Agua Caliente *725 Band of Cahuilla Indians v. Superior Court (2006) 40 Cal.4th 239, 249 [52 Cal.Rptr.3d 659, 148 P.3d 1126] (Agua Caliente).)
The ambiguous power to regulate commerce with the Indian tribes could be interpreted to grant the federal government exclusive control of relations with Indians residing on Indian lands, but some objected to that interpretation based on concerns about state sovereignty and the creation of enclaves of exclusive federal control within the states. (Worthen, supra, 1996 B.Y.U. L.Rev. at p. 419.) Two pragmatic considerations underlying the state sovereignty issue were (1) the denial of access to natural resources found on tribal lands within a state and (2) the creation of a haven for fugitives from state law. (Id. at pp. 419—420.) The latter concern is echoed in present day measures designed to prevent organized crime from infiltrating gambling on Indian reservations.
2. State Sovereignty over Indian Lands
In 1832, the ambiguity in the Indian commerce clause relating to the sovereignty of states in their dealings with Indian tribes was addressed by Chief Justice Marshall in Worcester v. Georgia (1832) 31 U.S. 515 [8 L.Ed. 483] (Worcester). The court struck down Georgia laws that asserted jurisdiction over Cherokee lands within Georgia’s borders. (See Worthen, supra, 1996 B.Y.U. L.Rev. at p. 421.) The court concluded the powers conferred on Congress by the United States Constitution “comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions.” (Worcester, supra, at p. 559.) In short, the court determined that “the federal government and not the States had authority over the Indian Tribes.” (Worthen, supra, at pp. 420-421.)
3. Indian Sovereignty
The nature of Indian sovereignty had been address by the United States Supreme Court the previous year in a case related to Worcester. (Cherokee Nation v. Georgia (1831) 30 U.S. 1 [8 L.Ed. 25].) The high court described Indian tribes as “domestic dependent nations,” which provided Indian tribes with some sovereignty, but distinguished them from foreign states or independent nations. (Id. at pp. 17, 19-20.) The court stated, “they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.”[3] (Id. at p. 17.)
Indian sovereignty also was discussed in Worcester, supra, 31 U.S. 515, and that discussion, which had traced the foundation of tribal sovereignty *726 from colonial times, was summarized recently by the California Supreme Court: “The court explained that since the arrival of the colonists on American soil, the tribes were treated as dependant sovereign nations, with distinct political communities under the protection and dominion of the United States. (Worcester, supra, 31 U.S. at pp. 549-561.) The tribes possessed territorial and governance rights with which no state could interfere. (Id. at p. 561.)” (Agua Caliente, supra, 40 Cal.4th at p. 247.)
As to the source of tribal sovereignty, the United States Supreme Court has addressed whether it was delegated to the tribes by Congress or is inherent in the tribe. (United States v. Wheeler (1978) 435 U.S. 313, 322 [55 L.Ed.2d 303, 98 S.Ct. 1079].) The court stated that Indian tribes are “subject to ultimate federal control,” but “remain ‘a separate people, with the power of regulating their internal and social relations.’ ” (Ibid.) Thus, Indian tribes retained some inherent powers of sovereignty, while some aspects of sovereignty were divested by incorporation within the territory of the United States, other aspects were yielded by treaty, and still others were removed by Congress. (Id. at p. 323.) “The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance.” (Ibid.)
4. Summary of Principles of Sovereignty
Three main points about sovereignty are relevant to this appeal. First, the federal government is placed above Indian tribes in the legal hierarchy—that is, tribal sovereignty is dependent on, and subordinate to, the federal government. (California v. Cabazon Band of Mission Indians (1987) 480 U.S. 202, 207 [94 L.Ed.2d 244, 107 S.Ct. 1083] (Cabazon).) Second, Indian tribes retain some, but not all, attributes of sovereignty over their members and their territory, but that sovereignty is subject to Congress’s plenary control. (Ibid.; United States v. Wheeler, supra, 435 U.S. at p. 323.) Third, state laws apply to tribal Indians on their reservations if and only if Congress has expressly so provided. (Cabazon, supra, at p. 207.) Thus, states have no authority to regulate Indian activities on reservation land, except where Congress has granted that authority.
These points demonstrate the dominant role Congress plays (1) in Indian affairs and (2) in defining what attempts by state governments to control activities of Indian tribes are valid. With this background, I turn to the statutes Congress has adopted to govern (1) the acquisition of new land for the benefit of Indian tribes for gaming and nongambling purposes and (2) Indian gambling in general.
*727 B. Indian Reorganization Act (IRA)
1. General Provisions
The passage of IRA (25 U.S.C. § 5101 et seq.) marked a dramatic shift in the federal government’s Indian policy, as the failure to assimilate tribal members into American society was recognized. (Worthen, supra, 1996 B.Y.U. L.Rev. at pp. 429-230.) The IRA terminated allotments of land to individual Indians (which had reduced reservation land), authorized the incorporation of Indian tribes, and granted Indian tribes the right to organize by adopting constitutions and bylaws. (25 U.S.C. §§ 5101, 5123, 5124; see County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation (1992) 502 U.S. 251, 255 [116 L.Ed.2d 687, 112 S.Ct. 683] [IRA brought an abrupt end to federal policy of allotment]; Washburn, Agency Conflict and Culture: Federal Implementation of the Indian Gaming Regulatory Act by the National Indian Gaming Commission, the Bureau of Indian Affairs, and the Department of Justice (2010) 42 Ariz. St. L.J. 303, 329 (Washburn) [IRA’s purpose was to reject allotment policies and halt erosion of tribal land base].) Although federal policy oscillated back towards assimilation in the 1950’s, it returned to Indian autonomy and self-determination under President Nixon. (See Clarkson & Murphy, Tribal Leakage: How the Curse of Trust Land Impedes Tribal Economic Self-Sustainability (Spring 2016) 12 J.L. Econ. & Pol’y 177, 187.) Throughout that time, the IRA’s provisions relating to land acquisition remained in effect.
2. Acquisition of Land: The Fee-to-trust Process
Under section 5 of the IRA, the Secretary is authorized to acquire land, “within or without existing reservations, ... for the purpose of providing land for Indians.” (25 U.S.C. § 5108.) One commentator described this provision of the IRA as giving the Secretary broad authority “to acquire lands for Indian tribes by virtually any voluntary means.” (Washburn, supra, 42 Ariz. St. L.J. at p. 329, fn. omitted.)
Section 5 of IRA also provides: “Title to any lands or rights acquired . . . shall be taken in the name of the United States in trust for the Indian tribe . . . for which the land is acquired, and such lands or rights shall be exempt from state and local taxation.” (25 U.S.C. § 5108.) Land held in trust (1) may not be sold or otherwise alienated without an act of Congress and (2) is exempt from state and local taxation. (Sheppard, Taking Indian Land Into Trust (1999) 44 S.D. L.Rev. 681, 682-683.) The acquisition of land and the holding of title in trust for the benefit of an Indian tribe is sometimes referred to as the fee-to-trust process. (See generally Comment, Extreme Rubber-Stamping: The Fee-to-Trust Process of the Indian Reorganization Act of 1934 (2012) 40 Pepp. L.Rev. 251.)
*728 Tribes may directly acquire real estate and hold it in fee simple. (Cass County v. Leech Lake Band of Chippewa Indians (1998) 524 U.S. 103, 111, 115 [141 L.Ed.2d 90, 118 S.Ct. 1904].) However, land acquired in that manner, even if former reservation land, is subject to state and local taxation. (Id. at p. 115.)
The federal regulations governing the acquisition of land by the United States in trust for Indian tribes are contained in part 151 of title 25 of the Code of Federal Regulations (2016). Under these regulations, “land may be acquired for a tribe in trust status” in three circumstances, including when the Secretary “determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.” (25 C.F.R. § 151.3 (2016).) Fand to be used for Indian gaming falls under this provision because gaming promotes self-determination and economic development. The Secretary’s decision whether to take land into trust to facilitate tribal self-determination and economic development involves the consideration of several factors, including the need of the tribe for the land, the purposes for which the land will be used, the impact on the state from removing the land from the tax rolls, potential conflicts of land use that may arise, the location of the land relative to state boundaries and the boundaries of the tribe’s reservation, and, in the case where land is being acquired for business purposes, the tribe’s plan specifying the anticipated economic benefits associated with the proposed use. (25 C.F.R. § 151.11(a)-(c) (2016); see 25 C.F.R. § 151.10(a)-(c) & (e)-(l) (2016).)
IGRA, discussed below, addresses the process the Secretary undertakes to authorize class III gaming on trust lands, but contains no provision authorizing the Secretary to take land into trust. Consequently, the Secretary’s statutory authority for taking land into trust derives from IRA. (Stand Up for California! v. U.S. Dept. of the Interior (D.D.C. 2016) 204 F.Supp.3d 212, 276.)
To summarize, IRA is the source of the federal authority for taking land into trust for Indian tribes. This authority is subject to further restrictions when a tribe’s fee-to-trust application under IRA proposes to use the land for gaming purposes. Those additional restrictions can be found in IGRA, the federal gaming legislation discussed below. (See pt. I.D., post.) IGRA and IRA define some of the requirements that must be met before an Indian tribe can build a casino on after-acquired trust lands. These federal requirements delineate Congress’s approach to the controversial issue of casinos on after-acquired trust lands.
*729 C. Developments in the 1980’s
1. Budget Cuts
Shortly after taking office in January 1981, President Reagan moved to abolish or reduce the funding of a variety of social programs. (Ducheneaux, The Indian Gaming Regulatory Act: Background and Legislative History (2010) 42 Ariz. St. L.J. 99, 110-111 (Ducheneaux).) The cuts in federal funding of programs administered by the Bureau of Indian Affairs (BIA) and the Indian Health Service affected tribal members living on reservations. (Id. at p. 111.) Indian tribes, lacking a sound tax base or thriving economy, searched for economic development activities and, partially as the result of federal court decisions, identified gaming (particularly bingo) as a potential source of revenue. (Ibid.)

2. Lower Court Decisions Relating to Indian Gaming

Part of the historical context for IGRA was established by court decisions involving attempts by state or county governments to regulate bingo on Indian reservations. The most important of these cases, Cabazon, supra, 480 U.S. 202, was decided by the United States Supreme Court in February 1987, shortly after Senator Daniel K. Inouye introduced the Indian gaming legislation that eventually became IGRA. (Boylan, Reflections on IGRA 20 Years After Enactment (2010) 42 Ariz. St. L.J. 1, 4 (Boylan); see Pub.L. No. 100-497 (Oct. 17, 1988) 102 Stat. 2467.) The legal environment at the time of the Cabazon decision included the following three cases upholding the legality of on-reservation bingo. (See Clinton, Enactment of the Indian Gaming Regulatory Act of 1988: The Return of the Buffalo to Indian Country or Another Federal Usurpation of Tribal Sovereignty? (2010) 42 Ariz. St. L.J. 17, 42 (Clinton) [Cabazon “constituted the culmination of the long train of federal judicial analysis of Indian commercial gaming”].)
In Seminole Tribe of Florida v. Butterworth (S.D.Fla. 1980) 491 F.Supp. 1015 (Seminole), an Indian tribe successfully sought to permanently enjoin a county sheriff from enforcing Florida’s bingo statute on the tribe’s land. (Id. at p. 1016.) In Oneida Tribe of Indians v. Wisconsin (W.D.Wisc. 1981) 518 F.Supp. 712 (Oneida), an Indian tribe filed a civil action and obtained declaratory relief stating that a Wisconsin statute relating to bingo operations could not be lawfully enforced on its reservation. (Id. at p. 713.) In Barona Group of Capitan Grande Band of Mission Indians v. Duffy (9th Cir. 1982) 694 F.2d 1185 (Barona), the Ninth Circuit of the United States Court of Appeals held that county and state laws could not be applied to bingo conducted by the tribe on its reservation in San Diego County, California. (Id. at p. 1190.)
*730 These decisions employed the same method of analysis. The courts recognized that state law would apply to activities on the reservations only if federal law granted that authority to the states and, accordingly, addressed whether Public Law No. 83-280 (Aug. 15, 1953) 67 Statutes at Large 588-590 did so.[4] That legislation conferred broad criminal jurisdiction and very limited civil jurisdiction. Consequently, the courts considered whether the state laws in question should be classified as criminal/prohibitory or civil/regulatory. (Seminole, supra, 491 F.Supp. at p. 1019; Oneida, supra, 518 F.Supp. at pp. 719-720; Barona, supra, 694 F.2d at p. 1188.) If the state laws were criminal/prohibitory, they would fall within Public Law No. 83-280’s grant of criminal jurisdiction to the states. In contrast, if the state laws were civil/regulatory, the federal statute did not authorize their enforcement on the reservations. In all three cases, the courts determined the laws in question were regulatory because they allowed bingo to be conducted in these states under certain circumstances rather than prohibiting it outright.[5] Consequently, the courts held those state laws could not be enforced on the reservations under the criminal jurisdiction granted to states by Public Law No. 83-280. In sum, if a state allowed bingo within its borders, it could not dictate how bingo was conducted on tribal lands.
3. 1987 United States Supreme Court Decision
In Cabazon, supra, 480 U.S. 202, two Indian tribes filed an action seeking a declaratory judgment that Riverside County had no authority to apply its ordinances or California’s statutes to bingo, draw poker and other card games conducted on their reservations. (Id. at pp. 205-206.) The district court granted the Indian tribes’ motion for summary judgment and, in 1986, the Ninth Circuit affirmed. (Id. at p. 206.) The United States Supreme Court also affirmed. (Id. at p. 222.) Some have characterized the Supreme Court’s decision as opening “the floodgates for tribal gaming.” (Note, Fencing the Buffalo: Off-Reservation Gaming and Possible Amendments to Section 20 of the Indian Gaming Regulatory Act (2014) 5 UNLV Gaming L.J. 101, 106.)
In part I of Cabazon, the Supreme Court accepted the prohibitory/regulatory distinction as the appropriate test for determining whether Public Law *731 No. 83-280 authorized the state to enforce its laws on an Indian reservation. (Cabazon, supra, 480 U.S. at p. 210.) The Supreme Court noted that bingo was legally sponsored by many different organizations and was widely played in California. (Id. at p. 211.) Based on “the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery,” the court concluded “that California regulates rather than prohibits gambling in general and bingo in particular.” (Ibid.) Consequently, the court concluded that Public Law No. 83-280 did not authorize the enforcement of California law within the reservations. (Cabazon, supra, at p. 212.)
In part II of the Cabazon opinion, the Supreme Court considered the state’s authority to regulate the activities of non-Indians on the reservations. (Cabazon, supra, 480 U.S. at pp. 215-216.) The court broadly framed the question as “whether the [s]tate may prevent the Tribes from making available high stakes bingo games to non-Indians coming from outside the reservations.” (Id. at p. 216.) The court then stated the specific legal issue as “whether state authority is pre-empted by the operation of federal law”—an inquiry that required the balancing of the federal and tribal interests against the state interests at stake. (Ibid.)
The court identified the relevant federal and tribal interests by referring to the congressional goals of Indian self-government, tribal self-sufficiency and economic development. (Cabazon, supra, 480 U.S. at p. 216.) The court described these as “important federal interests.” (Id. at p. 217.) The court supported its description by referring to (1) the President’s policy statement that self-government would be furthered by reducing tribal reliance on federal funding and (2) the actions of the Department of the Interior in promoting tribal bingo enterprises, including making grants and guaranteeing for loans for the construction of bingo facilities. (Id. at pp. 217-218.) As to tribal interests, the court stated the reservations contained no natural resources that could be exploited. (Id. at p. 218.) Furthermore, tribal games were the sole source of revenues for the operation of the tribal governments and the provision of tribal services, and were the major sources of employment on the reservations. (Id. at pp. 218-219.) Accordingly, tribal self-determination and economic development were closely connected to the tribal games. Against these federal and tribal interests, the sole interest asserted by California for imposing its laws on the tribes was to prevent the infiltration of organized crime into the tribal games. (Id. at p. 220.) The court regarded this as a legitimate concern, but it did not outweigh the federal and tribal interests supporting the tribal bingo and card club enterprises. (Id. at pp. 221-222.) As a result, the court concluded that the California laws were preempted by federal law and could not be applied to the tribal bingo and card games. (Id. at p. 222.)
*732 Cabazon (1) clarified how the existing federal statutes applied to tribal gaming and (2) described the limited authority of states to regulate gaming on Indian reservations. The court concluded that because Congress had not provided for the regulation of tribal gaming, a state could prohibit gaming on tribal lands only if the state completely prohibited all gaming within its borders.[6] (Cabazon, supra, 480 U.S. at pp. 210-211.) Cabazon provided further impetus for Congress to enact tribal gaming legislation.
D. Indian Gaming Regulatory Act
1. Overview
Congress passed IGRA in 1988 and it became effective on October 17, 1988. IGRA is the legal foundation for California’s adoption of Proposition 1A. IGRA’s primary purpose is “to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.” (25 U.S.C. § 2702(1).) Additional purposes of IGRA are shielding the tribe from organized crime and other corrupting influences; ensuring the tribe is the primary beneficiary of the gaming operation; and assuring the gaming is conducted fairly and honestly by both the operator and players. (25 U.S.C. § 2702(2).)
Once Congress decided to allow Indian gaming, it had to address what types of games to allow, who would regulate those games, and where the games could be offered. This last issue included the controversial topic of allowing casinos outside existing Indian lands. Congress exercised its plenary powers by (1) adopting classifications for the various types of games, (2) allocating regulatory responsibility for particular class of games among the tribes, states and federal governments, (3) generally prohibiting the expansion of casinos on lands taken into trust after the enactment of IGRA, and (4) providing specific exceptions to that general prohibition, including a procedure under which states could allow a proposed off-reservation casino by the Governor’s issuance of a concurrence—the very act that is challenged in this litigation.
As to the allocation of regulatory responsibility for high stakes casino-type gambling conducted on Indian land, Congress employed the concept of tribal-state gaming compacts under which the tribes and states would share *733 responsibility. As to the expansion of Indian gaming to off-reservation locations, Congress created a separate and distinct mechanism that required the approval of the Indian tribe, the federal government and the state. Specifically, the mechanism allowed Indian gaming on an off-reservation site only if the Secretary decided to take the new land into trust for gaming purposes and the state’s governor concurred in the Secretary’s decision. As shown below, the mechanism for authorizing off-reservation Indian gaming is separate and distinct from tribal-state compacts. Compacts allow Indian tribes to negotiate with states to determine the scope and regulations of gambling on Indian lands, if gaming is allowed in the state. Concurrences, on the other hand, are necessary for the proposed off-reservation casino to qualify for a specific exception to the general rule prohibiting casinos on after-acquired trust lands. Under this particular exception, a state’s governor can give a thumbs-up to an off-reservation casino by issuing a concurrence or, alternatively, can veto the proposed casino by withholding his or her concurrence.
2. Development and Enactment of IGRA
IGRA “is the outgrowth of several years of discussions and negotiations between gaming tribes, [sjtates, the gaming industry, the administration, and the Congress, in an attempt to formulate a system for regulating gaming on Indian lands.” (Sen.Rep. No. 100-446, 2d Sess., p. 1 (1988) (Sen.Rep. 100-446).) Professor Santoni provides an overview of the bills introduced from 1983 to 1988 that formed the legislative journey leading to the emergence of IGRA. (Santoni, The Indian Gaming Regulatory Act: How Did We Get Here? Where Are We Going? (1993) 26 Creighton L.Rev. 387, 395 (Santoni).) That overview and the many issues and compromises reached will not be repeated here.
Instead, this appeal is concerned with the issues and compromises that were addressed through the tribal-state compacts and the concurrence authority. Those matters include (1) the types of gaming allowed, (2) who regulates, or shares regulatory control over, the various types of gaming, and (3) where the gaming may be conducted. The concept of tribal-state compacts was used by IGRA to deal with the first two issues. IGRA adopted the state governor’s concurrence solely as a condition to the final approval of casino-style gaming on off-reservation lands.
3. IGRA’s Three Classes of Gaming
IGRA divided games into three classes and identified who was responsible for regulating each class. Class I games are “social games solely for prizes of minimal value or traditional forms of Indian gaming” connected with “tribal ceremonies or celebrations.” (25 U.S.C. § 2703(6).) “Class I gaming on *734 Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of [IGRA].” (25 U.S.C. § 2710(a)(1).) Thus, Indian tribes have complete control over class I gaming and the federal and state government have no role in regulating those games.
Class II gaming consists of bingo, games similar to bingo, and certain card games. (25 U.S.C. § 2703(7).) IGRA created ‘“a system for joint regulation by tribes and the Federal Government of class II gaming on Indian lands . . . .” (Sen.Rep. 100-446, supra, p. 1.) IGRA established the National Indian Gaming Commission (NIGC) as an independent agency within the Department of the Interior and assigned it a regulatory role for class II gaming. (Sen.Rep. 100-446, supra, p. 1.) Generally, a tribe may engage in, or license and regulate, class II gaming on Indian land if (1) the state where the gaming is located permits such gaming for any purpose by any person or entity, (2) the tribe has adopted an ordinance or resolution regulating the class II gaming, and (3) the NIGC has approved the ordinance or regulation. (25 U.S.C. § 2710(b)(1).)
Class III gaming—the type involved in this litigation—covers all other forms of gaming, such as ‘“slot machines, casino games including banking card games, horse and dog racing, pari-mutuel, jai-alai, and so forth.” (Sen.Rep. 100-446, supra, p. 3; 25 U.S.C. § 2703(8); Keweenaw Bay Indian Community v. U.S. (6th Cir. 1998) 136 F.3d 469, 473 (Keweenaw Bay) [class III includes “ ‘high-stakes casino-style’ gaming”].) The Select Committee on Indian Affairs, balancing the federal interest of preserving tribal sovereignty and the need for sound enforcement of gaming laws and regulations, developed a framework for the regulation of class III gaming on Indians lands that did not unilaterally impose state jurisdiction on Indian lands for the regulation of class III gaming activities, but instead allowed tribes to elect to have state laws and state jurisdiction extend to tribal lands. (Sen.Rep. 100-446, supra, pp. 5-6.)[7] Without this election by the tribe, class III gaming activities could not be conducted on its lands.
4. Tribal-state Compacts
The tribal election is exercised by requesting a tribal-state compact—‘“[t]he mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of [s]tate jurisdiction and the application of state laws to [class III gaming] conducted on Indian land . . . .” (Sen.Rep. 100-446, supra, p. 6.) IGRA ‘“does not contemplate and does not provide for *735 the conduct of class III gaming activities on Indian lands in the absen[c]e of a tribal-State compact.” (Sen.Rep. 100-446, p. 6.) Thus, in the view of the Select Committee on Indian Affairs, ‘“the compact process is a viable mechanism for setting various matters between two equal sovereigns” that both have significant governmental interests in the conduct of class III gaming. (Id. at p. 13.)
The idea of the compact mechanism appears to have been derived from a recommendation by the National Indian Gaming Task Force to Congress that suggested ‘“off-reservation gaming regulated by recognized Indian governments should be dealt with on the local and State level by means of agreements between the parties. Such agreements would provide protection as well as define their respective obligations.” (Indian Gambling Control Act, pt. I: Hearing on H.R. No. 1920 and H.R. No. 2404 before the House Com. on Interior and Insular Affairs, 99th Cong., 1st Sess., p. 173 (1985); see Clinton, supra, 42 Ariz. St. L.J. at pp. 58-60.) The proposed agreement, ‘“although expressly limited to ‘off-reservation gaming,’ may have been the first suggestion of the compact mechanism that ultimately became the compromise measure Congress adopted late in its legislative discussions to break the stalemate between opposing views on the question of class III gaming” and its regulation. (Clinton, supra, at pp. 59-60.) Accordingly, the revised version of Senate Bill No. 555, 100th Congressional Second Session (1988) that became IGRA “introduced the Tribal-State compact concept” as a compromise to resolve the disputes concerning appropriate jurisdiction over class III. (Santoni, supra, 26 Creighton L.Rev. at p. 403.)
IGRA provides that in states allowing class III “gaming for any purpose by any person, organization, or entity,” an Indian tribe and the state may enter a compact for the conduct of class III gaming on the Indian lands under the tribe’s jurisdiction. (25 U.S.C. § 2710(d)(1); see id. § 2710(d)(3).) To complete such a compact, tribes and states must negotiate a range of issues that relate to the scope of the games, standards for operating the games, regulatory responsibility, allocation of criminal and civil jurisdiction, liquor sales, and taxes on retail and restaurant outlets. (25 U.S.C. § 2710(d)(3)(C); Boylan, supra, 42 Ariz. St. L.J. at p. 8.) From the perspective of sovereignty, the tribal-state compact grants the state control over activities on Indian land that it would not have without the compact. In that sense, tribal-state compacts expand the state’s jurisdiction.
One reason Congress chose a mechanism that involved the states (as opposed to a federal agency) in regulating class III gaming was “that the expertise to regulate gaming activities and to enforce laws related to gaming could be found in state agencies, and thus that there was no need to duplicate those mechanisms on a Federal level.” (Sen.Rep. 100-446, supra, p. 5.) The *736 tribal-state compact mechanism would tap into this expertise and “assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises.” (Id. at p. 13.)
An issue not resolved by IGRA was which state official has the responsibility of negotiating the tribal-state compact. (Santee Sioux Tribe of Nebraska v. State of Nebraska (8th Cir. 1997) 121 F.3d 427, 431; see 25 U.S.C. § 2710(d)(3).) As a result of IGRA’s silence on this point, each state must decide that question for itself.[8]
The fact that tribes cannot conduct class III gaming on their lands without a gaming compact appears to give the states a great deal of power in negotiating the terms of the compact. This imbalance in power created the concern that the compact requirement for class III gaming might “be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.” (Sen.Rep. 100-446, supra, p. 13.) Consequently, IGRA restricted the authority of states by requiring them to “negotiate with the Indian tribe in good faith.” (25 U.S.C. § 2710(d)(3)(A); see Tsosie, Negotiating Economic Survived: The Consent Principle and Tribal-State Compacts Under the Indian Gaming Regulatory Act (1997) 29 Ariz. St. L.J. 25, 54-55 [statutory process for tribal-state compacts under IGRA].) To enforce this duty to negotiate, IGRA granted federal district courts jurisdiction over causes of action brought by tribes alleging the state failed to negotiate in good faith. (25 U.S.C. § 2710(d)(7)(A).) If the district court finds a lack of good faith, it may direct the parties to conclude a compact and, if that attempt is unsuccessful, select a mediator who will choose the proposed compact that best comports with IGRA. (25 U.S.C. § 2710(d)(7)(B)(iv); see Seminole Tribe of Fla. v. Florida (1996) 517 U.S. 44, 73-74 [134 L.Ed.2d 252, 116 S.Ct. 1114] [state’s duty to negotiate enforceable through by “the carefully crafted and intricate remedial scheme set forth in § 2710(d)(7)”].)
IGRA’s requirement that a state negotiate a tribal-state compact in good faith, and the remedies provided for the failure to negotiate in good faith, means that state control over the tribal-state compact is limited.[9] A state that *737 allows class III gaming within its borders cannot prevent an Indian tribe from conducting class III gaming on its lands by refusing to enter into a compact. In short, states are not given veto power over compacts, like they are with concurrences.
5. General Prohibition of Gaming on After-acquired Trust Land
IGRA authorizes gaming only on “Indian lands.” (25 U.S.C. § 2702(3); see Washburn, supra, 42 Ariz. St. L.J. at p. 330.) IGRA defines “ ‘Indian lands’ ” as (1) “all lands within the limits of any Indian reservation”; (2) any lands “held in trust by the United States for the benefit of any Indian tribe or individual”; and (3) any lands held in fee by any tribe or individual subject to a federal restriction on alienation. (25 U.S.C. § 2703(4).)
The inclusion of trust lands in this definition created a concern that, after enactment, tribal governments might acquire trust land in or near metropolitan areas and open bingo or casino facilities on that land. (Boylan, supra, 42 Ariz. St. L.J. at pp. 9-10.) IGRA addressed this concern by adding a separate provision, section 20, to address gaming on lands acquired in trust after October 17, 1988, the date of IGRA’s enactment. (25 U.S.C. § 2719; Boylan, supra, at p. 10.) Section 20 of IGRA prohibits gaming on after-acquired trust lands, unless a statutory exception applies. (25 U.S.C. § 2719(a).) Section 20 of IGRA has been referred to as an anti-proliferation provision. (Clinton, supra, 42 Ariz. St. L.J. at p. 58.)
6. Exceptions to Prohibition of Gaming on After-acquired Trust Land
The general prohibition of class III gaming on after-acquired trust land created concerns about unfair or dissimilar treatment of tribes without a land base and tribes not yet recognized by the federal government. (Boylan, supra, 42 Ariz. St. L.J. at p. 10.) To address these concerns, Congress created exceptions for (1) new and restored reservations and (2) acquisitions of land within an existing reservation and land outside an existing reservation. (Ibid.; see 25 U.S.C. § 2719(b).)
The various exceptions are addressed in part 292 of title 25 of the Code of Federal Regulations (Part 292), which is labeled “Gaming on Trust Lands Acquired After October 17, 1988.” (73 Fed.Reg. 29354, 29375 (May 20, 2008).) Part 292 contains the procedures used by the Department of the Interior to determine whether an exception applies. (See 25 C.F.R. § 292.1 (2016).)
*738 The exception relevant to this appeal requires the Governor’s concurrence and is described in the next subpart. The other statutory exceptions for after-acquired trust land that potentially could be applied in California involve (1) lands located within or contiguous to the boundaries of the tribe’s reservation on October 17, 1988 (25 U.S.C. § 2719(a)(1)); (2) lands acquired for a tribe whose last recognized reservation was within California and, as of October 17, 1988, the tribe had no reservation (25 U.S.C. § 2719(a)(2)(B)); and (3) land “taken into trust as part of—[¶] (i) a settlement of a land claim, [¶] (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or [¶] (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition” (25 U.S.C. § 2719(b)(1)(B)). As previously noted, I refer to these types of after-acquired trust lands as “nonconcurrence trust lands.”
None of these exceptions involve the concurrence by the Governor in any federal decision allowing an Indian tribe to conduct class III gaming on lands so taken into trust. Consequently, once a state has decided to allow class III gaming “for any purpose by any person, organization, or entity” (25 U.S.C. § 2710(d)(1)(B)), the state cannot block or otherwise prohibit class III gaming on nonconcurrence trust lands. The requirement for a tribal-state compact allows the state some input as to the gaming operations, but states do not have the ability to prevent class III gaming by refusing to enter into a tribal-state compact because IGRA specifically requires the state to negotiate a compact with the Indian tribe in good faith. (See pt. I.D.4., ante.) If the state fails to do so, secretarial procedures that take the place of a compact can be forced on the state under IGRA’s provisions that allow a federally appointed mediator to choose between the proposed compacts, if any, and then notify the Secretary of the choice. (See 25 U.S.C. § 2710(d)(7)(B)(iv)-(vii).) The Secretary shall prescribe, in consultation with the Indian tribe, procedures for the conduct the class III gaming that are consistent with the proposed compact selected by the mediator. (25 U.S.C. § 2710(d)(7)(B)(vii).)
To summarize, there are narrowly drafted exceptions in section 20 of IGRA that have the potential to result in casinos being operated by Indian tribes on after-acquired trust lands in California that do not involve or require the Governor’s concurrence. (25 U.S.C. § 2719(b).) In contrast, only one of the exceptions requires a state’s governor’s concurrence as a necessary condition to conduct class III gaming on after-acquired trust land. That issue is the focus of this appeal.
*739 7. Exception Involving Governor’s Concurrence
The exception relevant to this appeal has four main elements: (1) a tribal application submitted to the Secretary, (2) a consultation requirement imposed on the Secretary, (3) a two-part determination by the Secretary, and (4) the Governor’s concurrence in the Secretary’s determination. (25 U.S.C. § 2719(b)(1)(A).)[10] The exception “has become known as the ‘two-part determination’ exception to the prohibition on gaming on after-acquired lands.” (Boylan, supra, 42 Ariz. St. L.J. at p. 10, fn. omitted; see Picayune Rancheria of Chukchansi Indians v. Brown (2014) 229 Cal.App.4th 1416, 1421 [178 Cal.Rptr.3d 563].) To reiterate, it is the only exception that involves any kind of a concurrence from a state’s governor.
When after-acquired trust lands do not qualify for any of the other exceptions under section 20 of IGRA, a tribe may submit a written application to the Secretary requesting the Secretary to make the two-part determination. (25 C.F.R. § 292.13 (2016); see 73 Fed.Reg. 29354 (May 20, 2008) as corrected in 73 Fed.Reg. 35579 (June 24, 2008).) The Secretary’s two-part determination is made “after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes.” (25 U.S.C. § 2719(b)(1)(A).) The procedures for conducting the consultation process require a letter be sent to the appropriate officials soliciting comments and an opportunity for the applicant tribe to respond to those comments. (25 C.F.R. §§ 292.19 (2016) [letter and comment period], 292.20 (2016) [contents of consultation letter].)
After reviewing the tribe’s written application and completing the consultation process, the Secretary is in a position to decide both elements of the two-part determination—specifically, whether gaming on the land (1) “would be in the best interest of the Indian tribe and its members” and (2) “would not be detrimental to the surrounding community.” (25 U.S.C. § 2719(b)(1)(A).) If the Secretary determines an element is not met, the tribe must be informed of both the disapproval of application and the reasons. (25 C.F.R. § 292.21(b) (2016).) Alternatively, if the Secretary makes a favorable two-part determination, the Secretary will send the governor of the state written notification of its determination and findings of fact, a copy of the entire record, and a request for the Governor’s concurrence in the determination. (25 C.F.R. §§ 292.21(c), 292.22 (2016).)
The two-part determination exception was tailored to take into consideration federal, tribal, state and local interests affected by a proposed off-reservation casino. The evaluation of these interests requires the Secretary *740 and the Governor to make political judgments. The concurrence requirement gives the Governor, for practical purposes, veto or approval authority over off-reservation gaming.[11] (Boylan, supra, 42 Ariz. St. L.J. at p. 11.) The concurrence requirement, in contrast to the compacting mechanism, is not subject to a good faith requirement and, thus, gives the state the absolute power to prohibit the expansion of class III gaming to off-reservation sites. A rationale for granting a state this veto authority is that the state loses jurisdiction over the land taken into trust and such a loss should not occur without the state’s approval.
The two-part determination exception had been used only a few times to authorize off-reservation casinos when Proposition 1A was presented to the voters in 2000. For nearly 18 years after IGRA was enacted, there had been only three instances, all outside of California, where a governor had concurred in a two-part determination. (Off-Reservation Gaming: Land into Trust and the Two-Part Determination, Hearing before the Sen. Com. on Indian Affairs, 109th Cong., 2d Sess., p. 4 (2006), testimony of George Skibine, Acting Deputy Assistant Secretary, Policy and Economic Development for Indian Affairs, Dept, of the Interior.) As a result of these concurrences, off-reservation land in Wisconsin, Washington and Michigan was acquired in trust for purposes of Indian gaming.[12] Thus, in 2000 when California’s voters approved Proposition 1A, the exception involving a governor’s concurrence authority for off-reservation gaming had been rarely used.
*741 8. Intertwined Approvals Under IRA and IGRA
The construction and operation of a casino on land, like the site in this case, that was not held in trust for the tribe when the casino was proposed, cannot occur until (1) the land is taken into trust for the benefit of the tribe pursuant to IRA and (2) the requisite approvals of Indian gaming are obtained under IGRA. The fact that two federal statutes are involved raises questions about how the sequence in which the various approvals are obtained. A federal district court described the sequence in a federal lawsuit involving North Fork’s applications relating to its casino proposal: ‘“[T]he Secretary’s [two-part] decision under the IGRA must logically be finalized before the Secretary’s [land-to-trust] decision under the IRA can be made. Permitting gaming on trust land would be essential to the Secretary’s conclusion under the IRA that the acquisition meets the criteria listed in 25 C.F.R. Part 151, such as ‘[t]he need of the individual Indian or the tribe for additional land,’ and ‘[t]he purposes for which the land will be used.’ See 25 C.F.R. § 151.10. Similarly, the governor’s concurrence is plainly required before gaming on trust land can be permitted. See 25 U.S.C. § 2719(b)(1)(A). Therefore, in this case, approving a trust acquisition under the IRA prior to the governor’s concurrence would have been putting the proverbial cart before the horse: The Secretary would not yet have known whether gaming would be permitted and thus would have had no basis to ascertain whether the basic criteria for approving a trust acquisition had been met.” (Stand Up for California! v. U.S. Dept. of the Interior (D.D.C. 2013) 919 F.Supp.2d 51, 71.)
As to the relative timing of a fee-to-trust application under IRA and an application for a two-part determination for a proposed casino under IGRA, a tribe may submit its applications at the same time. (25 C.F.R. § 292.15 (2016).) The history of the applications relating to the casino site proposed by North Fork is set forth in part II, post.
E. California’s Proposition 5
Prior to the adoption of IGRA, the California Constitution set forth a fundamental public policy against the legalization in California of casino gambling. “The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey.” (Cal. Const., art. IV, § 19, subd. (e).)
After IGRA was enacted, several conflicts developed between the State of California and Indian tribes over class III gaming, particularly stand-alone gaming devices and live banking and percentage card games. (Hotel Employees & Restaurant Employees Internat. Union v. Davis (1999) 21 Cal.4th 585, 596-597 [88 Cal.Rptr.2d 56, 981 P.2d 990] (Davis).) To resolve *742 these conflicts relating to class III gaming on Indian lands, Proposition 5 was drafted and presented to California’s voters as an initiative statute, not a constitutional amendment. (Davis, supra, at pp. 597-598.)
In 1998, California’s voters approved Proposition 5. (Davis, supra, 21 Cal.4th at p. 589.) Proposition 5 purported to authorize the state to enter into tribal-state compacts as contemplated by IGRA, but because the measure was only statutory, it was held to be invalid in light of the constitutional gambling prohibition. (Davis, supra, at pp. 589-590.)
F. 1999 Compacts and Assembly Bill No. 1385 (1999-2000 Reg. Sess.)
Less than a month after the California Supreme Court invalidated Proposition 5, the State of California executed 57 tribal-state gaming compacts entered into pursuant to IGRA.[13] The compacts allowed, on reservation land that was not subject to the two-part determination and the Governor’s concurrence, the tribes to present a wider range of games than previously offered, including full Las Vegas-style slot machines, and provided tribes with the exclusive right to conduct class III gaming within California. (Comment, Gambling on Proposition 1A: The California Indian Self-Reliance Amendment (2002) 36 U.S.F. L.Rev. 1033, 1043-1044.) In exchange, the tribes agreed to (1) contribute to a special distribution fund to offset expenses incurred by the state in connection with tribal gaming and (2) revenue sharing that allocates funds to nongaming tribes. (Id. at pp. 1047-1049 [revenue sharing], 1051 [special distribution fund]; see Gov. Code, §§ 12012.75 [revenue sharing trust fund], 12012.85 [special distribution fund].)
On September 10, 1999—the same day the compacts were executed—both the Assembly and the Senate ratified the compacts by unanimously approving Assembly Bill No. 1385 (1999-2000 Reg. Sess.) (Assembly Bill 1385). This legislation is codified in sections 12012.25, 12012.75 and 12012.85 of the Government Code.[14] (See Stats. 1999, ch. 874, §§ 1-3, pp. 6257-6261.) For *743 purposes of this appeal, I note that Assembly Bill 1385 does not mention (1) off-reservation casinos or (2) the Governor concurring in the Secretary’s two-part determination related to taking off-reservation land into trust for gaming purposes. Furthermore, none of the 57 compacts ratified by Assembly Bill 1385 involved the two-part determination exception to IGRA’s general prohibition against gaming on after-acquired trust land and, therefore, did not require a Governor’s concurrence. (See generally California’s First Off-Reservation Casino, supra, 45 McGeorge L.Rev. 521.)
The 1999 compacts were conditioned upon the subsequent passage of Proposition 1A. (California Commerce Casino, Inc. v. Schwarzenegger (2007) 146 Cal.App.4th 1406, 1412 [53 Cal.Rptr.3d 626].) That proposition was drafted to amend the California Constitution and remove the grounds used to invalidate Proposition 5. (California Commerce Casino, Inc., supra, at p. 1412.)
G. Proposition 1A
1. Ballot Materials
In 2000, the initiative designated as Proposition 1A—“Gambling on Tribal Lands. Legislative Constitutional Amendment”—was presented to California’s voters. The Attorney General’s summary of Proposition 1A that appeared in the ballot pamphlet stated:
“Modifies state Constitution’s prohibition against casinos and lotteries, to authorize Governor to negotiate compacts, subject to legislative ratification, for the operation of slot machines, lottery games, and banking and percentage card games by federally recognized Indian tribes on Indian lands in California, in accordance with federal law.
“Authorizes slot machines, lottery games, and banking and percentage card games to be conducted and operated on tribal lands subject to the compacts.” (Voter Information Guide, Primary Elec. (Mar. 7, 2000) official title and summary of Prop. 1A, p. 4 (Voter Information Guide).)
The Legislative Analyst’s analysis of Proposition 1A, printed in the ballot pamphlet provided background on gambling in California, gambling on Indian land under IGRA, and gambling on Indian lands in California. (Voter Information Guide, supra, analysis of Prop. 1A by Legis. Analyst, p. 4.) The background information stated that California had over 100 Indian rancherias/reservations and about 40 Indian gambling operations, which *744 offered a variety of gambling activities. (Ibid.) The analysis (1) described the virtually identical compacts with 57 tribes that, in 1999, had been negotiated by the Governor and ratified by the Legislature and (2) stated that the compacts would become effective only if Proposition 1A was approved and the federal government approves the compacts. (Id., analysis of Prop. 1A by Legis. Analyst, pp. 4-5.) The analysis described the proposal by stating: “This proposition amends the State Constitution to permit Indian tribes to conduct and operate slot machines, lottery games, and banked and percentage card games on Indian land. These gambling activities could only occur if (1) the Governor and an Indian tribe reach agreement on a compact, (2) the Legislature approves the compact, and (3) the federal government approves the compact. (Although this proposition authorizes lottery games, Indian tribes can currently operate lottery games—subject to a gambling compact. This is because the State Constitution permits the State Lottery, and Indian tribes can operate any games already permitted in the state.)” (Id. at p. 5.)
The authorization of slot machines was a controversial part of Proposition 1A. The analysis addressed slot machines by stating that (1) the compacts would allow each tribe at least 350 slot machines and (2) tribes may pay for licenses for additional machines, but generally may not operate more than 2,000 machines. (Voter Information Guide, supra, analysis of Prop. 1A by Legis. Analyst, fig. 1, p. 5.)
Although the analysis stated that California had “over 100 Indian rancherias/reservations,” it did not mention off-reservation or after-acquired lands. (Voter Information Guide, supra, analysis of Prop. 1A by Legis. Analyst, p. 4.) It also provided no explanation of what was meant by its references to “tribal lands” and “Indian lands” and did not mention gambling outside existing reservations. The analysis also referred to the 57 tribal-state compacts and the process of entering such compacts. (Id. at p. 5.) It made no mention of a Governor’s concurrence, a two-part determination by the Secretary, or casinos proposed for off-reservation lands.
2. Arguments in Ballot Pamphlet
The arguments and rebuttals set forth in the ballot pamphlet addressed issues raised by the 57 tribal-state compacts and did not state directly whether Proposition 1A granted the Governor concurrence authority. On the topic of Indian gaming outside existing reservations, the proponents and opponents of Proposition 1A took different positions.
The proponents stated that they were seeking passage “so we can keep the gaming we have on our reservations.” (Voter Information Guide, supra, argument in favor of Prop. 1A, p. 6.) This argument implies that Proposition *745 1A did not address off-reservation casinos—an implication reinforced by the fact that none of the compacts proposed at that time required the Secretary’s two-part determination and the Governor’s concurrence. The proponents also asserted: “If Proposition 1A fails, tribal gaming would face being shut down. This would be devastating for California Indian Tribes—and bad for California’s taxpayers.” (Ibid.)
Opponents argued that “Proposition 1A and the Governor’s compact with gambling tribes will trigger a massive explosion of gambling in California.” (Voter Information Guide, supra, argument against Prop. 1A, p. 7.) One aspect of the predicted explosion related to location, as the opponents warned: “Casinos won’t be limited to remote locations. Indian tribes are already buying up prime property for casinos in our towns and cities.” (Ibid.) This argument implies that Proposition 1A would allow casinos on after-acquired trust lands, which contradicts the position implied by the proponents.
The proponents rebutted the arguments against Proposition 1A by quoting a former field investigator of the NIGC, who asserted: “ ‘Proposition 1A and federal law strictly limit Indian gaming to tribal land. The claim that casinos could be built anywhere is totally false.’ ” (Voter Information Guide, supra, rebuttal to argument against Prop. 1A, p. 7.) The rebuttal also quoted an economist who stated: “ ‘The majority of Indian Tribes are located on remote reservations and the fact is their markets will only support a limited number of machines.’ ” (Ibid.)
These passages show the proponents and opponents disagreed as to how Proposition 1A would be interpreted and applied to casinos outside existing reservations. Opponents wanted voters reading the pamphlet to believe gambling would spread outside existing reservations, while proponents wanted voters to believe gambling would be confined to existing reservations. The conflicting positions presented in the ballot pamphlet demonstrate that voters were not presented with a single interpretation of how Proposition 1A would be applied to off-reservation casinos.
3. Text of Constitutional Amendment
In November 2000, the voters approved Proposition 1A and amended section 19 of article IV of the California Constitution to include the following: “(1) Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in *746 accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.” (Cal. Const., art. IV, § 19, subd. (1); see Historical Notes, IE West’s Ann. Cal. Const. (2012 ed.) foil. art. IV, § 19, p. 604.)
The meaning of this text is analyzed in part IV, post.
II. History of the Madera Site
The proposal by North Fork for a casino in Madera County requires a variety of approvals and actions at the local, state and federal level. This part of the opinion sets forth a history of the various approvals and action relating to the Madera site and the proposed casino. Also, it describes some of the state[15] and federal lawsuits generated by the proposal, both in California and Washington, D.C.
A. 2004: Initial Plans and Federal Environmental Review
In 2004, North Fork began taking the steps necessary to implement its plan to build a gaming facility on land in Madera County. (Good Faith Compact Case I, supra, 2015 U.S.Dist. Fexis 154729 at p. *4.) The land is a 305-acre parcel located in an unincorporated portion of the county adjacent to State Route 99 just outside the northwest border of the City of Madera (Madera site). (Stand Up for California! v. U.S. Dept. of the Interior, supra, 919 F.Supp.2d at p. 54.) The proposed casino-resort complex includes a gaming floor offering up to 2,500 gaming devices, six bars, three restaurants, a five-tenant food court, a 200-room hotel tower, and 4,500 parking spaces. (Stand Up for California! v. U.S. Dept. of the Interior, supra, 204 F. Supp.3d 212, 226.)
In July 2004, soon after starting the process of acquiring the property,[16] North Fork entered into discussions with representatives of then-Governor *747 Arnold Schwarzenegger for a tribal-state gaming compact. (Good Faith Compact Case I, supra, 2015 U.S.Dist. Lexis 154729 at pp. *5-*6.) Later in 2004, BIA published a notice of intent to prepare an environmental impact statement (EIS) for North Fork’s proposed trust acquisition of the Madera site and the development of a casino-resort on that site. (69 Fed.Reg. 62721 (Oct. 27, 2004).) The notice provided the public an opportunity to comment on the scope and implementation of the proposal. Later, the comment period was extended to May 6, 2005. (70 Fed.Reg. 17461 (Apr. 6, 2005).) The federal environmental review process is mentioned here because that process took a long time and affected the timing of the other steps taken by North Fork.[17] (See 75 Fed.Reg. 47621 (Aug. 6, 2010) [final EIS released for public comment].)
B. Fee-to-trust Application Under IRA
In March 2005, North Fork submitted a formal fee-to-trust application to the Secretary requesting the Department of the Interior to accept trust title to the Madera site. The application was filed under section 5 of IRA (25 U.S.C. §5108) and its implementing regulations (25 C.F.R. §151 (2016)). The factors to be considered included any proposed business use and the anticipated economic benefits from that use. (See 25 C.F.R. § 151.11(c) (2016); see generally 25 C.F.R. § 151.11 (2016) [off-reservation acquisitions].)
As to tinting, North Fork’s formal fee-to-trust application was submitted to the Secretary after North Fork began discussing a tribal-state gaming compact for the site with the Governor and after the federal environmental review process started. The Secretary’s decision on the fee-to-trust application could not be made until after the environmental consequences of the proposed casino-resort project had been analyzed in a final EIS.
C. Two-part Determination Under IGRA
The appellate record does not show when North Fork applied to the Secretary for the two-part determination that was essential to qualifying for an exception to IGRA’s prohibition of class III gaming on after-acquired trust land. (See 25 U.S.C. § 2719(a) [general prohibition].) That application might have been submitted at the same time as the fee-to-trust application. (See 25 C.F.R. § 292.15 (2016) [application for two-part determination for land not yet held in trust may be submitted at the same time as the fee-to-trust application].)
*748 In September 2011, an assistant secretary for Indian affairs issued an IGRA record of decision that addressed the two-part determination contained in section 20 of IGRA. (25 U.S.C. § 2719.) The decision found that taking the Madera site into trust for the purpose of gaming (1) would be in the best interest of North Fork and (2) would not be detrimental to the surrounding community. (25 U.S.C. § 2719(b)(1)(A); see 25 C.F.R. § 292.13(c) (2016) [two-part determination].)
D. Tribal-state Compact and Governor’s Concurrence
While North Fork’s application for the Secretary’s two-part determination was under consideration, the Governor and North Fork pursued a tribal-state compact for Indian gaming on the Madera site. On August 31, 2012, the Governor announced that he had negotiated and signed a compact with North Fork for gaming on the 305-acre parcel and was forwarding the compact to the Legislature for ratification. The Governor also announced his concurrence in the Secretary’s two-part determination that placing the land in trust for North Fork for purposes of class III gaming would be in North Fork’s best interest and would not be detrimental to the surrounding community. The concurrence was set forth in a letter dated August 30, 2012.
E. IRA Record of Decision: Fee-to-trust
In November 2012, after the Secretary was informed of the Governor’s concurrence, another assistant secretary of Indian affairs issued an IRA record of decision stating the Secretary would exercise the authority granted by section 5 of IRA (25 U.S.C. §5108) and its implementing regulations (25 C.FR. § 151 (2016)) and approve the fee-to-trust application submitted by North Fork for the Madera site. The decision considered (1) the fee-to-trust application, the draft EIS, the final EIS, public comments, and applicable law; (2) alternatives to the proposed gaming-resort complex, including non-casino alternatives, a reduced casino, and a no-action alternative; and (3) mitigation measures relating to environmental impacts. Of the various alternatives, the decision concluded the proposed gaming-resort complex was the preferred alternative.
On February 5, 2013, the conveyance of the Madera site into trust was completed, despite the filing of a federal lawsuit challenging the Secretary’s decision on the fee-to-trust application. (See pt. H.H.2., post.)
F. Legislature ’s Ratification of the Tribal-state Compact
Later in February 2013, Assembly Bill No. 277 (2013-2014 Reg. Sess.) was introduced in the California Legislature to ratify the compact entered into *749 by the Governor and North Fork. By June 2013, Assembly Bill No. 277 had been passed by both houses of the Legislature. The bill was signed by the Governor on July 2, 2013, and became chapter 51 of the Statutes of 2013 (Chapter 51). In addition to ratifying the compact, Chapter 51 exempted the casino project from compliance with the California Environmental Quality Act (Pub. Resources Code, §21000 et seq.) (CEQA). (Stats. 2013, ch. 51, § 1(b).)
Chapter 51 is noteworthy because it is the first time the Legislature ratified a tribal-state compact for an off-reservation casino. (See California’s First Off-Reservation Casino, supra, 45 McGeorge L.Rev. 521.) Also, “Chapter 51 provides for direct revenue sharing with two specific Tribal Governments for the first time in a gaming compact.” (Id. at p. 530, fn. omitted.)
Following the Legislature’s ratification of the tribal-state compact, it was forwarded to the Secretary. On October 22, 2013, the Secretary published a notice in the Federal Register stating that “the compact is considered to have been approved, but only to the extent that [it] is consistent with IGRA.” (78 Fed.Reg. 62649 (Oct. 22, 2013); see 25 U.S.C. § 2710(d)(8)(C).)
G. Initiative Challenging Chapter 51
On July 8, 2013, while this litigation was pending, Cheryl Schmit submitted a written request to the Attorney General for a title and summary for a proposed statewide referendum rejecting the compact ratification statute, Chapter 51. The Attorney General issued the title and summary, and signatures were gathered. The referendum qualified for the November 2014 general election ballot and was designated Proposition 48. The referendum was phrased so that a “Yes” vote would approve Chapter 51’s ratification of two tribal-state gaming compacts, including the North Fork compact.
On November 4, 2014, approximately 4.2 million Californians (61 percent) voted “No” and 2.7 million Californians (39 percent) voted “Yes” on Proposition 48. As a result, the statute ratifying the tribal-state compacts was rejected. (Historical and Statutory Notes, 32E pt. 1 West’s Ann. Gov. Code (2016 supp.) foil. § 12012.59, p. 13.)
H. Federal Lawsuits

1.Good Faith Compact Case

The voters’ rejection of the statute ratifying the August 2012 compact between the State of California and North Fork caused the state to refuse to (1) recognize the existence of a valid tribal-state compact with North Fork *750 and (2) negotiate with North Fork regarding the conduct of gaming on the Madera site. (North Fork Rancheria of Mono Indians v. California (E.D.Cal., Aug. 10, 2016, No. 1:15-CV-00419-AWI-SAB) 2016 U.S.Dist. Lexis 105825, p. *4 (Good Faith Compact Case II).) In 2015, North Fork responded to the state’s refusals by filing a lawsuit in the United States District Court for the Eastern District of California and alleging the state violated IGRA by failing to negotiate a compact in good faith. (Id. at p. *1; see 25 U.S.C. § 2710(d)(3)(A) [“State shall negotiate with the Indian tribe in good faith”].)
In November 2015, the district court in Good Faith Compact Case I addressed competing motions for judgment on the pleadings, concluded the state had failed to enter negotiations as required by federal law, granted North Fork’s motion, and ordered the parties “to conclude a compact within 60 days of the date of this order.” (Good Faith Compact Case I, supra, 2015 U.S.Dist. Lexis 154729 at p. *44; see id. at pp. *1, *43.) When the parties failed to meet this deadline, the district court appointed a mediator pursuant to 25 United States Code section 2710(d)(7)(B)(iv). (Good Faith Compact Case II, supra, 2016 U.S.Dist. Lexis 105825 at p. *5.) The mediator selected the compact proposed by North Fork and gave the state 60 days within which to consent to that compact. (Ibid.) The state did not consent within that period and, consequently, the mediator notified the Secretary that no agreement had been reached. (Ibid.; see 25 U.S.C. § 2710(d)(7)(B)(iv).)
On July 29, 2016, as a result of the mediator’s notification, the Secretary informed the state and North Fork of the issuance of secretarial procedures for the conduct of class III gaming on North Fork’s land. (Good Faith Compact Case II, supra, 2016 U.S.Dist. Lexis 105825 at p. *5.)
In August 2016, the district court in the Good Faith Compact Case declined to issue a stay of its judgment, stated its order terminated the action in its entirety, and directed the clerk of the court to close the case. (Good Faith Compact Case II, supra, 2016 U.S.Dist. Lexis 105825 at p. *26.)
2. Cases Challenging Federal Approvals Under IRA and IGRA
In December 2012, lawsuits were filed in federal district court in Washington D.C. to challenge the Secretary’s approval of North Fork’s fee-to-trust application under IRA and the Secretary’s two-part determination under IGRA. (Stand Up for California! v. U.S. Dept. of the Interior, supra, 204 F.Supp.3d 212, 226-227, 234.) These lawsuits also challenged the Secretary’s October 2013 approval (by nonaction) of the August 2012 compact between California and North Fork. (Id. at p. 227.)
In September 2016, the district court rejected all challenges to the three separate, but related, federal approvals involving the proposed casino-resort *751 on the Madera site. The challenges included alleged violations of federal environmental statutes, the federal Administrative Procedures Act (5 U.S.C. § 551 et seq.), IRA and IGRA. (Stand Up for California! v. U.S. Dept. of the Interior, supra, 204 F.Supp.3d at p. 226.) As to the challenge to the validity of the Governor’s concurrence—the issue of state law presented in this appeal—the district court refused to consider the challenge, concluding the State of California was an indispensable party that had not been joined in the litigation. (Id. at p. 251.)
The district court described the secretarial procedures governing the conduct of class III gaming on the Madera site as follows: “The Secretarial Procedures provide that they constitute ‘the full and complete authorization by the Secretary of the Interior for the Tribe to conduct class III gaming in its Indian lands pursuant to IGRA,’ and ‘supersede any prior agreements or understandings with respect to the subject matter hereof.’ Secretarial Procedures at 92, 99 (§§ 14.1, 18.2). The Procedures further provide that, upon their effective date, ‘any and all prior tribal-state Class III gaining compacts entered into between the Tribe and the State shall be null and void and of no further force and effect.’ Id. at 99 (§ 18.2).” (Stand Up for California! v. U.S. Dept. of the Interior, supra, 204 F.Supp.3d at p. 240, italics added.)
I. Summary: Current Status of the Concurrence, Compact and Madera Site
The following is my understanding of the current status of (1) the Governor’s August 2012 concurrence, (2) the 2012 compact between the State of California and North Fork, and (3) the regulation of gaming on the Madera site.
1. 2012 Compact
The compact signed in 2012 has no force or effect. First, California’s voters rejected Chapter 51, the Legislature’s ratification of the compact. (See pts. II.F. & II.G., ante.) Second, the secretarial procedures issued in July 2016 superseded that compact and expressly declared it null and void and of no further force and effect. (Stand Up for California! v. U.S. Dept. of the Interior, supra, 204 F.Supp.3d at p. 240.)
The foregoing conclusion is reinforced by the fact that the parties have agreed in other lawsuits that the 2012 compact “is not in effect and will not govern the North Fork Tribe’s gaming operations at the Madera Site.” (Stand Up for California! v. U.S. Dept. of the Interior, supra, 204 F.Supp.3d at *752 p. 248.)[18] As a result, the district court concluded “the validity of the Compact is simply no longer at issue, and the plaintiffs’ claims that are premised upon the Compact’s alleged invalidity fail to provide a basis upon which relief can be granted.” (Stand Up for California! v. U.S. Dept. of the Interior, supra, at p. 248.)
2. 2012 Concurrence
The current status of the Governor’s 2012 concurrence in the Secretary’s two-part determination is one of the issues raised in this appeal. Here, we unanimously agree, for different reasons, that the 2012 concurrence is invalid under the facts alleged.
3. Gaming on Madera Site
The current status of class III gaming on the Madera site is uncertain. Part of the uncertainty relates to how the resolution of this lawsuit challenging the validity of the concurrence will impact the force and effect of the secretarial procedures approved in July 2016. Determining this decision’s impact on the secretarial procedures involves questions of federal law beyond the scope of the proceedings before us.
III. Interpreting a Voter Initiative
A. Standard of Review
Whether the Governor had the authority to concur in the Secretary’s two-part determination relating to the Madera site is a question requiring the interpretation of Proposition 1A. The meaning of a voter initiative such as Proposition 1A presents a question of law subject to de novo review. (In re Tobacco II Cases (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20].) Our independent review is guided by the following rules of interpretation.
B. Rules of Interpretation
1. Intent and Voter Understanding
Whether interpreting a statute adopted by the Legislature or a constitutional provision added by voter initiative, a court’s ultimate goal is the same— *753 effectuating the enactors’ intent. (Raging Wire, supra, 42 Cal.4th at p. 930 [statute adopted by initiative]; City and County of San Francisco v. County of San Mateo (1995) 10 Cal.4th 554, 562 [41 Cal.Rptr.2d 888, 896 P.2d 181] (San Mateo) [Prop. 13].) Consequently, courts interpreting the scope of a constitutional provision added by initiative generally apply the same principles that govern statutory constructions. (California Redevelopment Assn. v. Matosantos (2011) 53 Cal.4th 231, 265 [135 Cal.Rptr.3d 683, 267 P.3d 580].) There are a few principles tailored specifically to voter initiatives.
The standard used to determine the “ ‘intent’ ” of the voters when they adopt an initiative requires the court to place itself in the position of the average voter and determine how the average voter would have understood the proposed constitutional language. (Robert L. v. Superior Court (2003) 30 Cal.4th 894, 902 [135 Cal.Rptr.2d 30, 69 P.3d 951]; Legislature v. Eu (1991) 54 Cal.3d 492, 505 [286 Cal.Rptr. 283, 816 P.2d 1309]; see Elec. Code, § 9087.) In this standard, the average voter is an objectively reasonable person, who is presumed to be aware of laws existing at the time the initiative is adopted. (See Santos v. Brown (2015) 238 Cal.App.4th 398, 410 [189 Cal.Rptr.3d 234] [rebuttable presumption that voters are aware of existing laws].) I have located no precedent equating the average voter’s awareness of an existing law necessarily includes a detailed knowledge of the technical definitions contained in existing statutes or court decisions.
2. Words—Ordinary or Technical Meaning
The task of ascertaining meaning begins with the words of the constitutional provision in question and gives those words their natural and ordinary meaning. (San Mateo, supra, 10 Cal.4th at p. 562.) Courts construe words in initiatives “according to their ordinary meanings as understood by ‘the average voter.’ ” (Vandermost v. Bowen (2012) 53 Cal.4th 421, 494 [137 Cal.Rptr.3d 1, 269 P.3d 446] (Vandermost).) Stated another way, the people who adopted a constitutional provision are presumed to have understood its words in their ordinary and common sense. (Steinhart v. County of Los Angeles (2010) 47 Cal.4th 1298, 1319 [104 Cal.Rptr.3d 195, 223 P.3d 57] (Steinhart).)
The foregoing general rule is subject to an exception. Words are given “their natural and ordinary meaning, unless it appears they were used in some technical sense.” (Steinhart, supra, 47 Cal.4th at p. 1318, italics added.) Thus, where a word used in the constitutional provision “ ‘has a popular and also a technical meaning, “the courts will accord to it its popular meaning, unless the very nature of the subject indicates or the context suggests that it is employed in its technical sense.” ’ ” (Turlock Irrigation Dist. v. White (1921) 186 Cal. 183, 186 [198 P. 1060].)
*754 This exception and the rebuttable presumption that the average voter is aware of laws existing when the initiative is adopted leads to the question of whether the awareness of existing laws extends to technical definitions in those laws. In the civil law context, the California Supreme Court recently stated: “The particularized meaning of words in complex, legislatively enacted statutes has little bearing on the interpretation of words in an initiative . . . .” (Vandermost, supra, 53 Cal.4th at p. 494.) Harmonizing these principles about the meaning of words, I conclude that courts interpret words in voter initiatives by giving them their ordinary meaning, unless there is a reasonable basis for inferring that the average voter understood a word or phrase was employed in a particularized or technical sense.
3. Historical Context
The inquiry into the average voter’s understanding of an initiative is not limited to the provision’s text because the electorate does not approve initiatives in a vacuum. (Hi-Voltage Wire Works, Inc. v. City of San Jose (2000) 24 Cal.4th 537, 542 [101 Cal.Rptr.2d 653, 12 P.3d 1068].) The voter understanding of an initiative that amends the California Constitution is discerned by viewing the initiative’s language in its historical context. (Hi-Voltage Wire Works, Inc., supra, at p. 542.) This principle is why the historical context for Proposition 1A was set forth in part I of this opinion.
4. Ambiguity and the Ballot Pamphlet
As a general rule, if the language of a constitutional provision is clear and unambiguous, the plain meaning governs. (Silicon Valley Taxpayers’ Assn., Inc. v. Santa Clara County Open Space Authority (2008) 44 Cal.4th 431, 444 [79 Cal.Rptr.3d 312, 187 P.3d 37] (Silicon Valley).) Ambiguous means “susceptible to more than one reasonable interpretation.” (Hoechst Celanese Corp. v. Franchise Tax Bd. (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324].) An example of an ambiguity is where a word or phrase has both an ordinary meaning and a technical meaning.
When the language of a constitutional provision is ambiguous, courts consider extrinsic evidence in determining voter understanding, including the Legislative Analyst’s analysis and ballot arguments for and against the initiative. (Silicon Valley, supra, 44 Cal.4th at pp. 444-445; see Kelso, California’s Constitutional Right to Privacy (1992) 19 Pepp. L.Rev. 327, 342, fn. 69 [in a Nov. 1990 telephone poll, seven out of 10 voters stated voter pamphlets were important to their decisionmaking].) For instance, in Legislature v. Eu, supra, 54 Cal.3d at page 505, the California Supreme Court determined what the average voter was likely to conclude Proposition 140 meant based on “reading the proposed constitutional language as supplemented by the [ballot pamphlet’s] analysis and arguments.”
*755 As to the role of the arguments presented in the ballot pamphlet, our Supreme Court has recognized “the fact that ballot measure opponents frequently overstate the adverse effects of the challenged measure, and that their ‘fears and doubts’ are not highly authoritative in construing the measure. (DeBartolo Corp. v. Fla. Gulf Coast Trades Council (1988) 485 U.S. 568, 585 [99 L.Ed.2d 645, 108 S.Ct. 1392].)” (Legislature v. Eu, supra, 54 Cal.3d at p. 505.) In other words, the average voter does not naively accept every argument in the ballot pamphlet as accurate and true. An argument by the opponents of an initiative about a potential adverse consequence has a greater impact on voter understanding when the proponents fail to contradict that argument. {Ibid.)
5. Necessary Implications
The foregoing principles relating to the interpretation of voter initiatives are supplemented by the principles of construction that address implied terms in general and implied powers in particular.
The starting point for determining whether to recognize an implied provision is the general rule that directs the judiciary to “declare what is in terms or in substance contained [in a statute or constitutional provision], not to insert what has been omitted, or to omit what has been inserted . . . .” (Code Civ. Proc., § 1858, italics added; see California Fed. Savings & Loan Assn. v. City of Los Angeles (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297] [courts “may not, under the guise of construction, rewrite the law . . .”].) This general rule is not an absolute ban on implied provisions. “ ‘[W]hatever is necessarily implied in a statute is as much a part of it as that which is expressed.’ ” (Johnston v. Baker (1914) 167 Cal. 260, 264 [139 P. 86].) However, implications are necessary only in a relatively narrow set of circumstances: “As a rule, courts should not presume an intent to legislate by implication. [Citation.] ‘Although in years past it may have been necessary for courts to read into a statute provisions not specifically expressed by the Legislature, the modern rule of construction disfavors such practice. [Citation.]’ [Citation.] ‘ “[F]or a consequence to be implied from a statute there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied. ‘A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.’ ” ’ ” (Lubner v. City of Los Angeles (1996) 45 Cal.App.4th 525, 529 [53 Cal.Rptr.2d 24] (Lubner); see generally 2B Singer, Sutherland Statutes and Statutory Construction (7th ed. 2012) §§ 55:2, pp. 448^-52 [implied effects], 55:3, pp. 452^-57 [standards for determining what should be implied].)
This principle of “necessary implication” is compatible with our Supreme Court’s statement that “the initiative power is strongest when courts give *756 effect to the voters’ formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote.” (Raging Wire, supra, 42 Cal.4th at p. 930.)
6. Implied Powers
California’s approach to implied provisions includes a specific canon of construction for implied grants of power or authority. Generally, courts are reluctant to conclude that the omission of a power was inadvertent and, therefore, should be granted by implication. Our Supreme Court has stated that in grants of power “ ‘ “there is an implied negative; an implication that no other than the expressly granted power passes by the grant (Wildlife Alive v. Chickering (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537].) Our Supreme Court also has stated that “[i]t is well settled in this state that governmental officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute . . . .” (Dickey v. Raisin Proration Zone (1944) 24 Cal.2d 796, 810 [151 P.2d 505].)
IV. Off-reservation Casinos and the Power to Concur
A. Wording of Proposition 1A
Proposition 1A added subdivision (f) to section 19 of article IV of the California Constitution. That provision states in full: “Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.” (Italics added.)
This text expressly gives the Governor the authority to negotiate and conclude compacts. The text does not expressly grant the Governor the power to concur in the Secretary’s two-part determination relating to class III gaming on off-reservation lands. (25 U.S.C. § 2719(b)(1)(A).) Therefore, the question presented is whether the Governor has an implied concurrence power arising from the express grant of the power to negotiate and execute compacts.
*757 B. The Necessity of an Implied Concurrence Authority
1. Trial Court’s Riding
The trial court’s written ruling sustaining the demurrers of North Fork and the state defendants provided that the Governor’s power to concur arose by implication from his authority to negotiate and execute tribal-state compacts, as set forth in article IV, section 19, subdivision (f), of the California Constitution. The court concluded: “To hold otherwise would make the phrase ‘negotiate and conclude’ meaningless, where concurrence is necessary under, for example, the two-part test of 25 U.S.C. section 2719(b)(1)(A).”
2. Contentions by State Defendants
On appeal, the state defendants adopt the trial court’s position by arguing “the Governor’s concurrence with the Secretary’s [two-part] IGRA determination falls within the sphere of his existing compacting authority. (Cal. Const., art. IV, § 19, subd. (f); Gov. Code, § 12012.25, subd. (d).)” In their view, the Governor can “concur in IGRA determinations made by the Secretary when the concurrence is necessary to conclude negotiations under the Governor’s compacting powers.” Based on this view of the compacting authority, the state defendants conclude: “In short, the Governor’s concurrence was necessary to complete the North Fork Compact. As the superior court correctly observed, if the Governor did not have the power to grant this concurrence, his powers under article IV, section 19, subdivision (1), to ‘negotiate and conclude’ this Compact would become meaningless.” (Italics added.)
This approach to necessity by the state defendants, which is centered on the compact for the Madera site and not the compacting authority in general, is addressed in part IV.B.5., post.
3. Contention by Plaintiffs
Plaintiffs contend it is factually untrue that the compacting power would be rendered meaningless without the concurrence power. Plaintiffs also contend that the approach to “necessity” adopted by the trial court and the state defendants is contrary to California law because necessity is not evaluated by what is required in the particular, limited circumstances of a case.
Plaintiffs also examine the consequences of the opposing approaches to necessity, contending the ramifications of an implied concurrence authority *758 were not intended.[19] If an implied concurrence power is deemed not necessary to the compacting authority, the Governor would have no implied authority to concur in the Secretary’s two-part determination and, consequently, off-reservation land such as the Madera site could not be used for Indian gaming purposes. In effect, the absence of the implied power to concur would prevent the spread of class III gaming to off-reservation lands.[20] (See 25 U.S.C. § 2719(b)(1)(A).) Plaintiffs argue, in effect, that California’s voters “were not asked to vote” (Raging Wire, supra, 42 Cal.4th at p. 930) on spreading class III gaming to off-reservation lands under the two-part determination exception and there are no indications of an intent to extend class III gaming to such lands.
4. Necessity in a General Sense
The parties’ contentions raise two legal issues relating to necessity. The first involves necessity in a general sense and the second involves necessity for the compact for the Madera site entered in August 2012.
The determination of necessity in a general sense is governed by the following principle of law. “ ‘ “ ‘A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.’ ” ’ ” (Lubner, supra, 45 Cal.App.4th at p. 529.) Thus, for the concurrence authority to be implied, “ ‘there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied.’ ” (Woodland Joint Unified School Dist. v. Commission on Professional Competence (1992) 2 Cal.App.4th 1429, 1451 [4 Cal.Rptr.2d 227], italics omitted.)
In this case, the Governor’s compacting authority would remain fully in effect for potential gaming operations on reservations and other locations *759 qualifying as “Indian lands”[21] even if the Governor has no concurrence authority. The successful exercise of this compacting authority is established by the many gaming compacts entered into by the State of California and various Indian tribes, including the 57 compacts entered into in 1999 and validated by the adoption of Proposition 1A. (See Gov. Code, § 12012.25, subd. (a)(1)—(57).)[22] The existing compacts indisputably establish that the Governor’s concurrence in a two-part determination by the Secretary is not necessary for the Governor to be able to negotiate and conclude most tribal-state compacts. In other words, those compacts have been implemented and stand as examples of the effective exercise of the Governor’s compacting authority. Consequently, the Governor’s authority to negotiate and conclude compacts is not rendered nugatory (i.e., of no meaningful application) by absence of the authority to concur. Therefore, the concurrence authority is not necessary under the legal principle set forth in Lubner, supra, 45 Cal.App.4th at page 529, because it is reasonable to conclude the concurrence authority (1) was withheld intentionally to prevent the spread of class III gaming under the two-part determination exception or (2) was overlooked because it was not important to the 57 compacts that the proponents of Proposition 1A wanted approved by the state. This conclusion about necessity in the general sense is not contested by the state defendants or by the trial court’s analysis.
5. Necessity in a Particular Sense
The second issue relating to necessity is raised by the trial court’s determination and the state defendants’ argument that an implied power to concur is necessary for the Governor to exercise his powers under article IV, section 19, subdivision (1) of the California Constitution, to “negotiate and conclude” the compact with North Fork. The state defendants have cited, and I have located, no legal authority for the principle that necessity is determined by the particular circumstances of a case. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in an appellate brief must, if possible, be supported by citation to authority].) Accordingly, this approach to necessity does not apply the law of California as it currently exists. Furthermore, the state *760 defendants’ novel approach to necessity is not supported by reasoned argument. (See ibid, [each point in brief must be supported by argument].) Consequently, I am not convinced the legal principles defining when an implication is necessary should be changed in this case.
Alternatively, I note that the state defendants’ approach begs the question of whether the electorate meant to allow off-reservation casinos. In other words, the state defendants assume the Governor has the power to conclude this compact and, working backward from this assumption, infer that he must have the power to concur because a concurrence is essential to authorizing a casino on the Madera site. The last step of this contention is accurate—a concurrence is a necessary condition to the Secretary’s approval of a tribal-state compact for Indian gaming on land covered by the two-part determination exception, such as the Madera site. (25 C.F.R. § 292.23 (2016) [consequences of Governor’s nonconcurrence]; see 25 U.S.C. § 2710(d)(8) [Secretary’s approval or disapproval of compact]; Keweenaw Bay, supra, 136 F.3d at p. 475 [gubernatorial concurrence and a valid tribal-state compact are both necessary, but not sufficient, conditions for class III gaming on lands covered by two-part determination exception].)[23] Accordingly, I will address the merits of this reverse-engineered view of necessity by examining the state defendants’ underlying and unstated assumption—namely, that the voters understood Proposition 1A as authorizing the Governor to approve casinos on sites covered by the two-part determination exception.
C. Meaning to the Average Voter
As described earlier, courts regard the average voter as an objectively reasonable person who is presumed to be aware of the historical context, including the laws existing at the time the initiative is adopted, and who gives the initiative’s words their ordinary meaning unless the context or subject matter shows a term was used in a technical sense. (See part III.B., ante.)
1. Historical and Legal Con text for Proposition 1A
The average voter, presumed to be aware of existing laws, would have been aware of (1) the controversy involving the spread of casinos outside existing reservations and (2) the differences between the responsibility for entering into compacts with Indian tribes and a governor’s authority to concur in the Secretary’s two-part determination. These differences demonstrate that the authority to concur is not part and parcel of the compacting responsibility.
*761 First, the structure of IGRA and the implementing federal regulations show that the compacting responsibility is distinct from the concurrence authority. Tribal-state compacts are addressed in section 11 of IGRA (25 U.S.C. § 2710) and parts 291 and 293 of title 25 of the Code of Federal Regulations (2016). In comparison, the concurrence condition is part of the two-part determination exception set forth in section 20 of IGRA. (25 U.S.C. § 2719(b)(1)(A); see pt. I.D.7., ante.) The federal regulations refer to the concurrence condition only in subpart C of part 292. (25 C.F.R. §§ 292.13-292.25 (2016).)[24] Thus, the structure of IGRA and the implementing regulations treat the compacting responsibility as a subject separate from the two-part determination exception and its concurrence condition.
Second, the distinction between compacting and concurring is evident from the purpose or function each serves. The tribal-state compact was adopted by Congress as a compromise mechanism to balance the interests of Indian tribal sovereignty and state jurisdiction in controlling class III gaming on Indian lands and, in effect, forces them to share control. (25 U.S.C. § 2710.) Indian sovereignty on tribal lands is respected to the extent that a compact cannot be forced on a tribe. However, tribes wishing to conduct class III gaming must elect to enter into a compact and, thus, share with the state control over the class III gaming on the tribal lands. From the state’s perspective, the compact increases its jurisdiction or authority over tribal lands by granting it shared control over the gaming operations conducted on those lands—control that it would not have without a compact.
In contrast, a governor’s concurrence or consent is a requirement of the two-part determination exception, which is one of a handful of exceptions to the general prohibition of class III gaming on after-acquired trust lands. (25 U.S.C. § 2719(b); see pts. I.D.6. & I.D.7., ante.) The concurrence condition in not based on the idea of shared sovereignty—the grant, denial or withholding of a concurrence is exclusively within the control of the state. Consequently, the state must give its consent to allow off-reservation gambling on lands covered by the two-part determination exception. The impact on state sovereignty that results from taking land into trust for gaming purposes is much greater than the impact of a tribal-state compact. State sovereignty over the land is diminished when that land goes into trust and the land is removed from the state and local tax base. In contrast, a compact expands state jurisdiction by providing some regulatory control over the gaming operations on Indian lands.
*762 Third, states that have authorized class III gaming within their borders do not have the unfettered right to refuse to enter into a compact with an Indian tribe that requests a compact for gambling on historical tribal lands. IGRA requires such states to enter into a compact and, moreover, provides a mechanism for implementing a tribal-state compact if the state does not participate in good faith negotiations with the Indian tribe. (25 U.S.C. § 2710(d)(7); see Seminole Tribe of Fla. v. Florida, supra, 517 U.S. at pp. 73-74 [state’s duty to negotiate is enforceable through “the carefully crafted and intricate remedial scheme” set forth in IGRA].)
In contrast, IGRA provides no parallel mechanism for forcing a state’s governor to concur in the Secretary’s two-part determination. A governor’s refusal to concur effectively vetoes the proposal to take land into trust for class III gaming purposes. (See Boylan, supra, 42 Ariz. St. L.J. at p. 11 [“governor’s concurrence authority amounts to a veto or approval”].) Thus, when an electorate withholds from the Governor the power to concur, that withholding acts as a blanket veto of all requests for concurrence in the establishment of off-reservation casinos under the two-part determination exception. Without a grant of concurrence authority, the general prohibition in section 20 of IGRA would apply and prevent the expansion of off-reservation gaming to locations in California such as the Madera site. (25 U.S.C. § 2719(a).)
In sum, the compacting responsibility is distinct from the concurrence authority in many ways—structurally, conceptually, and functionally. An objectively reasonable voter is presumed to have been aware of these distinctions. That voter also would have been aware that IGRA (1) used the concept of tribal-state compacts to deal with questions of Indian sovereignty and state jurisdiction to control and regulate class III gaming, (2) adopted a general prohibition to deal with the controversial issue of off-reservation casinos, and (3) employed an intricate set of exceptions to the general prohibition to address specific concerns about unequal treatment among the tribes. One of those exceptions was conditioned upon obtaining the concurrence of the Governor in the Secretary’s two-part determination. With the foregoing awareness, an average voter would have understood the relationship between the Governor’s power to concur and off-reservation casinos.
Having established the average voter’s state of awareness, I turn to the question of how that voter would have understood the text of Proposition 1A and the ballot pamphlet.
2. Text of Proposition 1A
I first consider what understanding the average voter would have reached after reading the text of Proposition 1A. The voter would have seen from the *763 text that Proposition 1A dealt with the issue of which state official is responsible for negotiating the tribal-state compact by granting the Governor of the authority to negotiate and conclude compacts, subject to ratification by the Legislature. This issue arises because IGRA simply refers to negotiations with the state and does not designate which state official is responsible for negotiating the tribal-state compact. (See 25 U.S.C. § 2710(d)(3).) The text of Proposition 1A also deals with another of IGRA’s unresolved issues by identifying the type of games that may be offered and regulated under a tribal-state compact.
Voters also would have seen that the text of Proposition 1A does not expressly (1) grant or withhold the authority to concur in the Secretary’s two-part determination or (2) authorize or prohibit class III gaming on off-reservation lands. In the face of this silence, the voter would turn to the ballot pamphlet to see whether its contents addressed the issue of the concurrence power or, more generally, the controversial issue of off-reservation casinos.
3. Summary and Analysis in Ballot Pamphlet
The official title given to Proposition 1A by the Attorney General was “Gambling On Tribal Lands. Legislative Constitutional Amendment.”[25] (Some capitalization omitted.) The summary prepared by the Attorney General made no mention of the concurrence authority. (See pt. I.G.I., ante.) Similarly, it did not mention off-reservation casinos.
The analysis provided by the Legislative Analyst[26] mentioned neither the concurrence authority nor whether the proposition would allow off-reservation casinos in California. The analysis included four paragraphs describing the fiscal effect of Proposition 1A on state and local revenue. The description of fiscal effects contained a notable omission. It did not state that revenue from real estate taxes would be reduced when land was removed from the state and local tax base as a result of being taken into trust for *764 Indian gaming purposes. (See 25 U.S.C. § 5108.) This omission suggests that the analyst thought Proposition 1A would not result in land being removed from the tax base and, thus, no reduction in revenues from real estate taxes would occur. (Elec. Code, § 9087, subd. (a) [analysis shall describe any decrease in revenue to state or local government].) Thus, a voter reading the pamphlet would infer that Proposition 1A would not result in the acquisition of land in trust for purposes of Indian gaming and, as a result, would infer that the Governor would not be authorized to concur in the Secretary’s two-part determination. Stated from another perspective, the analysis of the Legislative Analyst did not indirectly inform voters of the possibility of off-reservation casinos by telling them of the removal of land from the state and local tax base.
In sum, the analysis of the Legislative Analyst does not inform voters that Proposition 1A would (1) grant the Governor the power to concur in the Secretary’s two-part determination, (2) allow class III Indian gaming to spread to off-reservation locations, or (3) remove land from the state and local tax base. If Proposition 1A is construed to allow casinos on land covered by the two-part determination exception, the analysis of the Legislative Analyst did a woefully inadequate job of informing the average voter of that consequence.
4. Arguments in Ballot Pamphlet
The arguments in favor and against Proposition 1A and the rebuttals to those arguments did not explicitly mention the concurrence authority. As to whether casinos might be operated on after-acquired trust lands, the proponents and opponents presented different positions about the effect of Proposition 1A.
The proponents took a narrow view of Proposition 1A, stating they sought approval of “Proposition 1A so we can keep the gaming we have on our reservations.” (Voter Information Guide, supra, argument in favor of Prop. 1A, p. 6.) In contrast, the opponents stated: “Proposition 1A and the Governor’s compact with gambling tribes will trigger a massive explosion of gambling in California.” (Voter Information Guide, supra, argument against Prop. 1A, p. 7.) Under the opponents’ interpretation of Proposition 1A: “Casinos won’t be limited to remote locations. Indian tribes are already buying up prime property for casinos in our towns and cities.” (Voter Information Guide, supra, argument against Prop. 1A, p. 7.) The proponents’ rebuttal disagreed with this interpretation of Proposition 1A and included the following quote from Carl Olson, former federal field investigator of NIGC: “ ‘Proposition 1A and federal law strictly limit Indian gaming to tribal land. *765 The claim that casinos could be built anywhere is totally false.’ ”[27] (Voter Information Guide, supra, rebuttal to argument against Prop. 1A, p. 7.)
To summarize their positions, the proponents and opponents did not address the technical matter of whether the Governor had concurrence authority, but phrased their arguments in terms of where casinos could be located. As to the potential locations of casinos, they disagreed.
Faced with this disagreement between the proponents and the opponents of Proposition 1A, the impact of conflicting arguments in the ballot pamphlet on the understanding of the average voter should be considered. As discussed in part III.B.4., ante, the average voter recognizes that ballot measure opponents frequently overstate the adverse effects of the challenged measure. As a result, the opponents’ expressions of fears are not highly authoritative, particularly when proponents contradict the opponents’ argument about a particular consequence, as was done here. (See Legislature v. Eu, supra, 54 Cal.3d at p. 505.) Accordingly, I conclude that the opponents’ argument about casinos being located in towns and cities is not necessarily how the average voter would have understood Proposition 1A and, by extension, would have understood that off-reservation casinos could be built in California.
5. “On Indian lands in California in accordance with federal law ”
The state defendants’ textual argument for why Proposition 1A grants the Governor the power to concur is based on the last three prepositional phrases of the first sentence of article IV, section 19, subdivision (1), of the California Constitution. They argue that “on Indian lands in California in accordance with federal law” (Cal. Const., art. IV, § 19, subd. (1)) plainly refers to federal law and, thus, IGRA’s definition of “ ‘Indian lands’ ” (25 U.S.C. § 2703(4)). That definition includes “all lands within the limits of any Indian reservation” and “any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual . . . .” (Ibid.) The state defendants contend IGRA’s definition is not exclusively limited to lands acquired in trust before 1988, but allows lands to become Indian lands even if acquired in trust after 1988.
In my view, the issues involving the interpretation of the term “Indian lands” are irrelevant to deciding whether an authority to concur is necessarily implied from the Governor’s compacting power. (See fns. 21 & 25, ante.) Assuming IGRA’s technical definition of “Indian lands” is the appropriate *766 way to interpret Proposition lA’s use of that term, it does not follow that the power to concur is a necessary implication of power to compact. As explained earlier, the compacting responsibility is distinct from the concurrence authority in many ways—structurally, conceptually, and functionally. As a result, the compacting responsibility can be meaningfully executed without a concurrence authority. Furthermore, the omission of a grant of the concurrence authority is a rational way to prevent the spread of class III gaming to sites covered by the two-part determination exception. Alternatively, if the omission was not made for the purpose of limiting the spread of casinos, the omission may have been designed to leave unaddressed a matter that was not important to the 57 compacts that the proponents of Proposition 1A wanted approved by the state. If this were the case, the proponents omitted the authority to concur in the Secretary’s two-part determinations to avoid the risk that Proposition 1A would be defeated because it addressed an issue unimportant to the proponents’ main goal.
In short, whatever interpretation is given the prepositional phrases “on Indian lands in California in accordance with federal law” in Proposition 1A, those phrases did not inform the average voter that Proposition 1A impliedly granted the Governor the power to concur in the Secretary’s two-part determination.
6. Identity of Proponents
Next, I consider the possibility that the average voter was alerted to the possibility that Proposition 1A allowed Indian gaming to expand to off-reservation sites by virtue of who acted as proponents for the measure.
The ballot pamphlet identified the argument in favor of Proposition 1A as being presented by the chairmen of three tribes. Those tribes had tribal-state compacts that the passage of Proposition 1A approved. (See Gov. Code, § 12012.25, subd. (a)(31), (36) & (56) [Pechanga Band of Luiseno Indians, Rumsey Band of Wintun Indians, and Viejas Band of Kameyaay Indians].) Thus, the proponents were interested in the approval of on-reservation class III gaming and may have been indifferent or actually opposed to the competition that would result from allowing off-reservation casinos in California. Furthermore, neither the parties nor I have identified a single compact among the 57 compacts approved by Proposition 1A that required the Governor’s concurrence in a two-part determination by the Secretary. Accordingly, the identity of the proponents of Proposition 1A and those benefited by the approval of the 57 compacts mentioned to in the ballot pamphlet did not provide the average voter with a basis for inferring that Proposition 1A allowed Indian gaming to expand to off-reservation lands pursuant to under the two-part determination exception.
*767 7. Conclusion
First, the text of Proposition 1A plainly omits the power to concur in the Secretary’s two-part determination. Second, an implied grant of that power is not necessary under the principles of California law that govern necessary implications. Third, the wording of Proposition 1A and the materials in the ballot pamphlet did not inform the average voter that approving Proposition 1A would grant the Governor the power to concur or, more generally, would grant the Governor the authority to either veto or approve a proposed off-reservation casino. Fourth, expanding Indian gaming to off-reservation locations was and is a controversial question of public policy with a wide range of consequences, and it is implausible that the average voter would have understood that Proposition 1A granted the Governor an implied authority to concur and thereby allowed off-reservation casinos. The controversy should not be resolved by implication when the voters were not informed that such an implication existed.
“For a court to construe an initiative statute to have substantial unintended consequences strengthens neither the initiative power nor the democratic process; the initiative power is strongest when courts give effect to the voters’ formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote.” (Raging Wire, supra, 42 Cal.4th at p. 930.) Bluntly stated, California’s voters were not asked to vote on the concurrence power.
V. Executive Authority of the Governor
A. Contentions of the Parties
Plaintiffs’ opening brief addresses the possibility that the state defendants would argue that the authority to concur in the Secretary’s determination is inherent in the Governor’s executive power to “see that the law is faithfully executed.” (Cal. Const., art. V, § 1.) Plaintiffs counter this possibility by (1) noting that the trial court rejected the argument and (2) asserting that the power to create new Indian law for purposes of gaming is a legislative power that the Governor cannot exercise without explicit constitutional or statutory authority.
The state defendants’ response does not include an inherent-executive-authority argument. Instead, they contend that because the Governor concurred under his existing executive powers, he did not unconstitutionally exercise legislative authority. The state defendants identify the source of the existing executive power to concur with the Secretary’s two-part determination as article IV, section 19, subdivision (1), of the California Constitution and section 12012.25 of the Government Code.
*768 B. Inherent Executive Authority
1. Broader Rationale
My analysis of inherent executive authority contains broader conclusions than the analysis set forth in the lead opinion. In other words, I have resolved questions of law not reached by the lead opinion.
My analysis begins with the general grant of executive power to the Governor, which is set forth in article V, section 1 of the California Constitution: “The supreme executive power of this State is vested in the Governor.” In my view, when the phrase “supreme executive power of this State” is harmonized with the constitutional provisions expressly addressing casino-type gambling, that general executive authority does not encompass the power to provide the concurrence referenced in section 20 of IGRA. (See 25 U.S.C. § 2719(b)(1)(A).)
The California Constitution contains a general prohibition of all casino-type gambling statewide. (Cal. Const., art. IV, § 19, subd. (e).) The faithful execution of this general prohibition cannot extend to acts that would have the effect of expanding casino-type gambling in California unless such acts are authorized elsewhere in the Constitution. A harmonious interpretation of the Constitution requires that executive action conflicting with a general constitutional prohibition must be expressly authorized to be valid.
Here, the voters adopted a specific exception to the general prohibition of casino-type gambling when they approved Proposition 1A. That specific exception addresses the topic of tribal-state gaming compacts authorized by IGRA and, more particularly, the Governor’s authority with respect to such compacts. The voters chose to adopt language that does not grant the Governor the authority to concur. That choice should not be undone by an expansive reading of the executive power. The state defendants have not so argued. Thus, I do not interpret the Governor’s general executive power as inherently authorizing him to take the specific step of concurring in the Secretary’s two-part determination. Another way of stating this conclusion is that the field of casino-type gambling in California has been fully occupied by the provisions in section 19 of article IV of the California Constitution and the authority for any state action that furthers casino-type gambling in California must be rooted in subdivision (1) of section 19 of article IV.
In addition, the foregoing view of inherent executive authority is not contradicted by Californian or Anglo-American legal tradition. The Secretary’s two-part determination did not exist prior to the 1988 adoption of IGRA and, thus, the possibility of a governor concurring in that determination is not addressed by tradition.
*769 2. Third District’s Decision
On October 13, 2016, in United Auburn Indian Community of Auburn Rancheria v. Brown (2016) 4 Cal.App.5th 36 [208 Cal.Rptr.3d 487] (United Auburn), the Third District “concluded that the power to concur was executive, rather than strictly legislative, and that by exercising the power the Governor did not violate the separation of powers clause of the state Constitution.” (Id. at p. 53, fn. 3.) The court explicitly stated that it did not reach the issue of whether the Governor’s concurrence was necessary and incidental to his powers to negotiate and execute a class III gaming compact. (Ibid.)
I note the Third District did not address whether an inherent executive power to concur conflicts with the ban on casinos in subdivision (e) of section 19 of article TV of the California Constitution. In addition, the court did not address the narrower question presented by the facts of this case—an inherent executive authority validating a concurrence related to a tribal-state compact that has been rejected by the voters of California.
Thus, strictly speaking, the conclusion reached here about the Governor’s executive power not validating the August 2012 concurrence does not conflict directly with the rationale expressed by the Third District. (See Loeffler v. Target Corp. (2014) 58 Cal.4th 1081, 1134 [171 Cal.Rptr.3d 189, 324 P.3d 50] [cases are not authority for propositions not considered or decided].) Nonetheless, the outcome of this case conflicts with the outcome reached by the Third District when it affirmed the judgment of dismissal entered after a demurrer was sustained to a complaint challenging the validity of a Governor’s concurrence relating to land in Yuba County. This conflict might be a reason for the California Supreme Court to grant review.
VI. Implied Ratification of Concurrence
I agree with the conclusion stated in part IV.B. of the lead opinion that the voters’ rejection of the Legislature’s ratification of the compact means the Legislature’s ratification does not operate to validate the August 2012 concurrence. My reasons for joining that conclusion go beyond those stated in the lead opinion. Specifically, I conclude the Legislature cannot validate the Governor’s concurrence because there is no constitutional or other basis for issuing a concurrence in the first place. The Governor’s August 2012 concurrence was void ab initio. Any purported ratification by the Legislature of a void concurrence also would violate the California Constitution.
*770 VII. Nonbinding Guidance for the Trial Court
A. Construing the Opinions
1. Law of the Case
The disposition of this appeal requires further proceedings on remand. Those proceedings will be affected by the doctrine of law of the case. (See generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 459-480, pp. 515-540.) Under that doctrine, when an appellate court states a principle or rule of law necessary to its decision, that principle or rule becomes the law of the case and must be adhered to in subsequent proceedings, both in the trial court and upon subsequent appeal. (Tally v. Ganahl (1907) 151 Cal. 418, 421 [90 P. 1049].) The doctrine applies only to an appellate decision on a question of law.
Precisely what questions of law have been decided by this court in a way that is binding in further proceedings might generate disagreement on remand. Therefore, to provide some guidance for counsel and the trial court in those proceedings, I set forth my understanding of the legal issues that have been decided in this appeal and the legal issues that remain “at large”—that is, are not subject to a binding decision by this court and remain for the trial court to decide in the first instance.
2. Scope of Agreemen t with Lead Opinion
I agree with part I. of the lead opinion and the legal conclusions in footnote 4 of part II. of the lead opinion that (1) the Governor’s authority to concur must come from state, not federal, law and (2) the source of that authority must be the constitutional provision added by Proposition 1A and not a statute.
As to part III. of the lead opinion, I agree with the ultimate conclusion that the Governor “cannot exercise an implied power [to concur] in a case where the voters have vetoed an exercise of the express power on which the implied power [was] based,” but have decided questions of law that provide a broader rationale for this ultimate conclusion. (Lead opn., ante, at p. 700.)
As to part IV.A. of the lead opinion, I agree with the ultimate conclusion that the Governor’s inherent executive authority does not validate the August 2012 concurrence, but have concluded that there is never an inherent executive authority to concur because the subject of casino gambling is addressed exclusively by article IV, section 19, subdivisions (e) and (f) of the California Constitution and the inherent executive authority cannot be used to *771 implement off-reservation gambling not authorized by Proposition 1A. I also agree with the lead opinion’s rationale and ultimate conclusion relating to Government Code section 12012 and article V, section 4 of the California Constitution.
As to part IV.B. of the lead opinion, I agree with the ultimate conclusion that there was no implied ratification of the Governor’s August 2012 concurrence by the Legislature, but have concluded that the Governor’s concurrence was void ah initio and, thus, could not be made valid by an implied ratification by the Legislature.
As to part V. of the lead opinion, I agree with the conclusion that the claims are not moot. My rationale is broader in that I conclude effective relief is available to plaintiffs in the form of (1) a writ of mandate directing the Governor to set aside the invalid concurrence and (2) declaratory judgment stating that the concurrence was void ah initio. (Wilson & Wilson v. City Council of Redwood City (2011) 191 Cal.App.4th 1559, 1574 [120 Cal.Rptr.3d 665] [controversy is not moot if the court can grant the plaintiff any effectual relief].)
B. Causes of Action
On remand, the most practical questions concern (1) the cause or causes of action that plaintiffs will be allowed to pursue and (2) the elements of the cause or causes of action. The disposition provides that plaintiffs have stated a cause of action for a writ of mandate to set the concurrence aside on the ground that it is unsupported by legal authority. A majority has not been able to agree on the particular legal grounds for the conclusion that the Governor lacked the legal authority to concur under the facts of this case, which creates uncertainty about (1) the elements that must be proven to establish plaintiffs’ cause or causes of action and (2) the relief obtainable.
1. Three Opinions, Three Legal Theories
When reviewing a demurrer, appellate courts decide whether the complaint has stated a cause of action under any legal theory. (McCall v. PacifiCare of Cal., Inc. (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) In this appeal, each of the three opinions has adopted a different legal theory for why a cause of action has been stated. Each legal theory has different elements. The following is my understanding of what those elements are.
The lead opinion concludes the Governor has no authority to concur when the proposed casino would be operated under authority other than a state-approved compact. Under this legal theory, the elements plaintiffs must prove *772 to be entitled to relief are (1) the issuance by the Governor of a concurrence related to the Madera site and (2) the absence of a state-approved compact for the Madera site. Here, that absence was brought about when California’s voters rejected the statute ratifying the tribal-state compact. If these elements are proven, the August 2012 concurrence would be invalid under the legal theory adopted in the lead opinion.
My understanding of Justice Detjen’s opinion is that the Governor lacks the authority to concur when the Governor has not properly exercised the compacting authority, such as when the compact in question relates to a site that was not Indian land when the compact was negotiated and concluded.[28] Under this legal theory, plaintiffs must prove that (1) the Governor negotiated and concluded a compact for the Madera site (2) when that site was not held in trust for North Fork (or otherwise was Indian land as that term is defined in IGRA) and (3) the Governor issued a concurrence related to or connected with that compact. If these elements are proven, the concurrence would have been void ah initio.
Under the legal theory I have adopted, the Governor has no power to concur in any two-part determination made by the Secretary. Therefore, any issuance of a concurrence by the Governor violates California law. Upon proof that the Governor issued a concurrence in a two-part determination, plaintiffs will be entitled to a declaratory judgment stating the concurrence was void ab initio and a writ of mandate directing the Governor to set aside and vacate the concurrence.
On remand, the trial court will be required to decide which of the three legal theories plaintiffs will be allowed to pursue. We have not been able to agree on the test that the trial court should use in interpreting our opinions, but one approach to an appellate decision, where a two-justice majority has not adopted a single rationale explaining the result, is to interpret the holding as being on the narrowest grounds that supports the judgment (i.e., the disposition). (See Marks v. United States (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990].) This approach will work in situations where the trial court determines that one legal theory is the logical subset of another, broader legal theory. (See People v. Dungo (2012) 55 Cal.4th 608, 628 [147 Cal.Rptr.3d 527, 286 P.3d 442] (cone. opn. of Chin, J.).)
I recommend that the trial court consider (1) avoiding the inquiry into the narrowest common ground that creates a two-justice majority and (2) going *773 forward on all three legal theories. Proof of elements of each legal theory appears to be relatively straightforward and it may be efficient for the trial court to consider and decide all of the theories at once, rather than risk the possibility of a later remand for further proceedings on an omitted theory. The trial court also might find it efficient to state separately the relief obtained under each theory or, alternatively, if the relief granted is identical under each theory, to explicitly state that conclusion. If the trial court rejects these suggestions, it might have to analyze whether the conclusion reached by the Third District in the section of its opinion titled “Negotiating Before Land Was Taken into Trust” is binding precedent that precludes the trial court from applying the legal theory recognized by Justice Detjen. (United Auburn, supra, 4 Cal.App.5th at p. 53, italics omitted.)[29]
2. Theories Not Addressed in This Decision
Out of caution, I note there may be additional legal theories for the proposition that, under the facts of this case, the Governor lacked the authority to concur that are not addressed by our opinions. I believe any theories not so addressed would be “at large” on remand and, as a result, the *774 trial court would decide in the first instance the legal questions of (1) whether California recognized a cause of action under any such legal theories, (2) of the elements of any such cause of action, and (3) the relief that might be obtained.
C. Inherent Executive Authority
All three justices agree in the conclusion that, under the facts alleged in this case, any inherent executive authority that the Governor might have does not validate the Governor’s August 2012 concurrence. Also, as addressed in part V.B.2., ante, the opinions in this case decide legal issues that were not addressed by the Third District in United Auburn, supra, 4 Cal.App.5th 36. Thus, I believe that neither the conclusion nor the rationale adopted in United Auburn about the scope of the Governor’s executive powers is binding on the further proceedings to be conducted on remand.
Moreover, Justice Detjen and I agree that the ban on casinos set forth in subdivision (e) of section 19 of article IV of the California Constitution prevents the Governor from having the inherent executive authority to concur in the Secretary’s two-part determination. I believe this two-justice majority resolves a question of law in a manner that will become law of the case unless the California Supreme Court grants review in this appeal.
The petition of respondent North Fork Ranchería of Mono Indians for review by the Supreme Court was granted March 22, 2017, S239630.

 For purposes of this opinion, I use the phrase “off-reservation casinos” to mean casinos located on “after-acquired trust land” for which the Secretary of the Interior’s (Secretary) two-part determination and the Governor’s concurrence is required before casino-type gambling may proceed at that location.
I use the phrase “after-acquired trust land” to refer to land acquired by the United States in trust for the benefit of an Indian tribe after October 17, 1988. That date is the effective date of the Indian Gaming Regulatory Act. (IGRA; 25 U.S.C. § 2701 et seq.; cf. 25 U.S.C. § 2719(b)(1)(A) [statute uses term “newly acquired lands”].) The phrase “after-acquired trust land” is broad and covers both “off-reservation land” and “nonconcurrence trust land.”
I use the phrase “off-reservation land” to mean after-acquired trust land for which the Secretary’s two-part determination and the Governor’s concurrence is required before casino-type gambling may proceed at that location. Accordingly, the phrase “off-reservation casino” refers to a casino proposed or operating on off-reservation land. The terms “off-reservation land” and “off-reservation casino” are significant in this appeal because the site in question is off-reservation land and, thus, the North Fork Ranchería of Mono Indians’s (North Fork) proposed casino is an off-reservation casino.
I use the phrase “nonconcurrence trust land” to refer to after-acquired trust land that is not “off-reservation land” but might become the site for a casino under provisions of federal law that do not require a Governor’s concurrence. This type of land is not involved in this appeal and the term is defined for use in providing background about IGRA. (See pt. I.D.6., post.)

 Under the ripeness branch of California’s doctrine of justiciability, I conclude the first amended complaint and matters judicially noticed present a set of facts sufficient to frame the issue of whether the Governor was granted an implied concurrence power. (See Pacific Legal Foundation v. California Coastal Com. (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306] [ripeness and justiciability].) Therefore, I conclude the legal question of whether Proposition 1A granted the Governor an implied power to concur' is ripe and, accordingly, it is not premature to resolve that issue of constitutional interpretation.

 This language, which makes one cringe today, suggests a policy of assimilation. Assimilation of Indians into the United States’s European-based society was the federal policy pursued until the Great Depression.

 This federal statute “conferred criminal and civil jurisdiction over Indian country to certain states and authorized other states to take the necessary action to assume such jurisdiction. Six states, including California, were initially granted jurisdiction under Public Law 83-280. A few others, including Florida, assumed jurisdiction under this Act ...."’ (Ducheneaux, supra, 42 Ariz. St. L.J. at p. 105, fns. omitted; see 18 U.S.C. § 1162 [criminal jurisdiction]; 28 U.S.C. § 1360 [civil jurisdiction].)

 For example, the district court in Seminole concluded: “It seems plain that Florida, in permitting bingo to be run by certain groups in a restricted manner, has acknowledged certain benefits of bingo and has chosen to regulate rather than prohibit.” (Seminole, supra, 491 F.Supp. at p. 1020.) This decision was affirmed in Seminole Tribe of Florida v. Butterworth (5th Cir. 1981) 658 F.2d 310.

 Few states have sacrificed the tax revenues and fees they receive from lottery and other gaming activities within their states in order to obtain authority under Cabazon and title 25 United States Code section 2710(d)(1)(B) to prohibit gambling on Indian lands. (See Note, Casting A New Light on Tribal Casino Gaming: Why Congress Should Curtail the Scope of High Stakes Indian Gaming (1999) 84 Cornell L.Rev. 798, 802-803 [asserting 46 states allow gaming in a form that, under IGRA, allows high stakes Indian gaming].)

 Some tribes opposed any federal or state regulation of gaming on tribal lands, preferring exclusive tribal regulation. (Clinton, supra, 42 Ariz. St. L.J. at pp. 58-59.) Others were willing to accept some outside regulation, provided it was done by the federal government. (Id. at p. 59.)

 For example, in State ex rel. Stephan v. Finney (1992) 251 Kan. 559 [836 P.2d 1169], the Kansas Supreme Court determined the Kansas Governor could negotiate tribal-state compacts, but had no power to bind the state to the compact because that power was held exclusively by the Legislature. (Id., 836 P.2d at p. 1185; State ex rel. Clark v. Johnson (1995) 120 N.M. 562, 578 [904 P.2d 11] [Governor of New Mexico lacked constitutional or statutory authority to enter into tribal-state gaming compacts].)

 Potentially, when a federal court finds the state has not negotiated in good faith, the state essentially loses its power to participate in the compact process, which is what eventually occurred with this proposed project. (See North Fork Rancheria of Mono Indians v. California (E.D.Cal., Nov. 13, 2015, No. 1:15-CV-00419-AWI-SAB) 2015 U.S.Dist. Lexis 154729.) The *737 foregoing lawsuit involved the Madera site and generated two decisions cited in this opinion. I refer to the lawsuit as Good Faith Compact Case, the November 2015 decision as Good Faith Compact Case I and the August 2016 decision as Good Faith Compact Case II.

 The federal regulations addressing the exception and its four elements are set forth in subpart C of Part 292. (See 25 C.F.R. §§ 292.13-292.25 (2016).)

 The concurrence condition can be traced to a House of Representative’s bill proposed in the 99th Congress (1985-1986) that would have required the Secretary consult with a state’s governor to ascertain the state’s public policy on gaming. (Clinton, supra, 42 Ariz. St. L.J. at p. 57.) This gubernatorial consultation requirement related to gaming on existing Indian land and was not adopted. However, a similar device—the governor’s concurrence—subsequently became part of the anti-proliferation provisions in section 20 of IGRA addressing gaming on after-acquired trust land. (Clinton, supra, at pp. 57-58; 25 U.S.C. § 2719(b)(1)(A).) The legislative history of the provisions requiring input from a governor (including the provision requiring concurrence) shows that the concurrence condition developed apart from the compacting mechanism and, thus, is not an integral or essential piece of the compacting authority.

 The three tribes were the Forest County Pottawatomi Tribe in Wisconsin (1990); the Kalispel Tribe in Washington (1997); and the Keweenaw Bay Indian Community in Michigan (2000). (Boylan, supra, 42 Ariz. St. L.J. at p. 11, fn. 50.) Boylan also referred to the 2008 tribal-state compact that Governor Schwarzenegger negotiated with the Fort Mojave Indian Tribe, but that compact was not ratified by the Legislature and the Secretary did not publish a notice of approval in the Federal Register. (Cf. Gov. Code, § 12012.45, subd. (a)(2) [Aug. 23, 2004, compact between California and the Fort Mojave Indian Tribe ratified]; 69 Fed.Reg. 76004 (Dec. 20, 2004) [notice of approval of compact between California and Fort Mojave Indian Tribe].)

 The tribal-state compacts are identified in paragraphs (1) through (57) of subdivision (a) of section 12012.25 of the Government Code. None of these compacts required a Governor’s concurrence. (See generally Note, Chapter 51: Approval of Tribal-State Gaming Agreements Governing California’s First Off-Reseivation Casino (2014) 45 McGeorge L.Rev. 521 (California's First Off-Reservation Casino).)

 The legislative history for Government Code section 12012.25 provides no guidance as to the voters’ understanding of the later adopted constitutional provision because none of the indicia of the Legislature’s intent was before the voters. (7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 124, p. 231, citing Delaney v. Superior Court (1990) 50 Cal.3d 785, 801 [268 Cal.Rptr. 753, 789 P.2d 934].) But even if the voters were aware of the materials in that legislative history, they would not have understood Proposition 1A as granting the concurrence authority because the materials do not mention concurrence or off-reservation *743 casinos. (See, e.g., Legis. Counsel’s Dig., Assem. Bill No. 1385 (1999-2000 Reg. Sess.) 5 Stats. 1999, Summary Dig., p. 411.)

 See Picayune Rancheria of Chukchansi Indians v. Brown, supra, 229 Cal.App.4th at page 1420 (Governor was not subject to California’s environmental statute when he concurred in federal determination relating to North Fork’s gaming proposal for the Madera site).

 Before the Madera site was transferred into trust for the benefit of the tribe in February 2013, it was owned by North Fork’s development partner, SC Madera Development, LLC. That company is a subsidiary of Nevada-based Station Casinos. (California’s First Off-Reservation Casino, supra, 45 McGeorge L.Rev. at pp. 528-529.) Critics of the proposal describe it as an example of “ ‘ “reservation shopping” ’ ” that places a casino in a prime location. (Id. at p. 529, fn. 79; see Fletcher, Bringing Balance to Indian Gaming (2007) 44 Harv. J. on Legis. 39, 67 [“ ‘reservation shopping’ ” is “a political code word” that links off-reservation Indian gaming expansion to non-Indian gaming developers].) North Fork and Station Casinos have signed a casino management contract that gives Station Casinos the right to operate the casino and receive 24 percent of its net income.

 For example, a tribal-state gaming compact was executed by Governor Schwarzenegger in April 2008, but was never presented to the Legislature for ratification because of delays resulting from the lengthy federal environmental review process. (Good Faith Compact Case I, supra, 2015 U.S.Dist. Lexis 154729 at p. *6.)

 Similarly, in Good Faith Compact Case I. the court stated that “it is undisputed that the State and the Tribe have not entered into an enforceable compact” immediately before it decided the motions for judgment on the pleadings filed by the state and North Fork. (Good Faith Compact Case I, supra, 2015 U.S.Dist. Lexis 154729 at p. *22.)

 “As a general rule of statutory construction, courts should consider the consequences that will flow from the various interpretations under consideration. (Conley Press, Inc. v. Superior Court (2006) 39 Cal.4th 1272, 1291 [48 Cal.Rptr.3d 183, 141 P.3d 288].) An analysis of the consequences involves evaluating the results generated by a proposed statutory interpretation when it is applied to different factual situations that might arise.” (Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership (2015) 238 Cal.App.4th 370, 394—395 [190 Cal.Rptr.3d 13].) This rule about the consequences of the interpretations considered applies with equal force to constitutional provisions adopted by voter initiative. (E.g., Provigo Corp. v. Alcoholic Beverage Control Appeals Bd. (1994) 7 Cal.4th 561, 567 [28 Cal.Rptr.2d 638, 869 P.2d 1163] [plain meaning of constitutional provision rejected to avoid absurd consequences].)

 The absence of a concurrence power would not prevent additional on-reservation casinos or casinos approved for nonconcurrence trust lands because casinos on these types of land do not require a concurrence. (See fn. 1, ante [definition of “nonconcurrence trust lands”].)

 The legal questions of whether “Indian lands” is ambiguous and, if so, what meaning should be adopted are irrelevant to my rationale for deciding that an authority to concur is not necessarily implied from the Governor’s compacting power. In short, the meaning of the term “Indian lands” is a red herring to resolving the necessity of implying a power to concur. I note, however, the state defendants (1) have not acknowledged that Proposition 1A uses the term “Indian lands” and “tribal lands” interchangeably and (2) have not analyzed whether this use rendered “Indian lands” reasonably susceptible to definitions other than the technical one contained in IGRA. (See 25 U.S.C. § 2703(4).)

 The following are a few of the more recent examples of gaming compacts between the State of California and Indian tribes: (1) the February 28, 2013, compact with the Fort Independence Indian Community of Paiute Indians; (2) the December 4, 2013, compact with the Karuk Tribe; and (3) the August 4, 2016, compact with the Agua Caliente Band of Cahuilla Indians. (Gov. Code, §§ 12012.60, 12012.62, 12012.79.)

 In contrast, the discretionary concurrence of a governor is not required when a proposed casino will be built on reservation lands because, in that situation, the state is not losing jurisdiction over any land. Consequently, the onlyf state approval required for an on-reservation casino is the tribal-state compact.

 Part 292 deals with the exceptions that allow gaming “on lands acquired by the United States in trust for an Indian tribe after October 17, 1988, if other applicable requirements of IGRA are met.” (25 C.F.R. § 292.1 (2016).) Subpart C of part 292 is devoted to the Secretary’s two-part determination and the governor’s concurrence in that determination.

 The Attorney General chose to use the term “tribal lands” instead of “Indian lands,” a term defined by IGRA. An interpretation that adopts IGRA’s technical definition of “Indian lands” would render the Attorney General’s choice of title, the use of the term “tribal lands” in the text of Proposition 1A, and the many references to “tribal lands” in the ballot pamphlet misleading because the ordinary meaning of “tribal lands” differs from IGRA’s definition. (See fn. 21, ante.) Deciding the meaning of “Indian lands” is irrelevant to my rationale for deciding that the authority to concur does not arise by necessary implication from the Governor’s compacting authority.

 California statute directs the Legislative Analyst to “prepare an impartial analysis of the measure describing the measure and including a fiscal analysis.” (Elec. Code, § 9087, subd. (a).) The analysis “shall generally set forth in an impartial manner the information the average voter needs to adequately understand the measure.” (Id., subd. (b).)

 This statement refers to “tribal lands” rather than using the term “Indian lands” or “Indian country,” both of which have particularized meanings under federal statutes. (See 18 U.S.C. § 1151 [“ ‘Indian country’ ”]; 25 U.S.C. § 2703(4) [“"‘Indian lands’ ”].)

 Timeline of the events: (1) September 2011—the Secretary issues a two-part determination under IGRA for the Madera site; (2) August 2012—the Governor and tribe complete a compact and the Governor issues a concurrence in the Secretary’s two-part determination; (3) November 2012—the Secretary decides to take the Madera site into trust under IRA; and (4) February 2013—the Madera site is conveyed into trust.

 In addition to the discussion in United Auburn, the sequence of the various federal approvals or actions was described by a federal district court. That description is quoted in part I.D.8., ante, and states that the Secretary’s decision to take land into trust under IRA is made after a governor has concurred in the Secretary’s two-part determination. Thus, the sequence of the federal decisions, when joined with an interpretation of Proposition 1A that requires a particular site be taken into trust under IRA before the Governor may negotiate a tribal-state compact and issue a concurrence, appears to create a catch-22. The catch is that the Secretary will not approve the acquisition of trust land without the concurrence of the Governor and the Governor’s authority to concur (as well as the authority to compact) is conditioned upon the land being held in trust.
One consequence of this catch might be to bar, in effect, the building and operation of casinos on sites in California that require a concurrence—a consequence consistent with the broader interpretation adopted in this opinion. Alternatively, the Secretary might alter its usual procedures to work around the catch for proposed casinos in California. As to situations not presented in this case—namely, the application of the exceptions contained in section 20 of IGRA that do not involve a two-part determination and a governor’s concurrence, interpreting Proposition 1A to contain a temporal condition creates another set of complexities and, depending upon how federal law is applied, may lead to unintended consequences. Those other exceptions still require a tribal-state compact. If the land to which those exceptions are being applied is not yet held in trust, the governor will not have the authority to negotiate a compact. The governor’s inability to negotiate compacts for lands not yet held in trust might be considered a violation of IGRA’s requirement for good faith negotiations. (See KG Urban Enterprises, EEC v. Patrick (1st Cir. 2012) 693 F.3d 1, 23 [“Secretary’s views on whether tribal-state compacts may be approved before the tribe possesses land that is taken into trust have varied over the years.”].) Such a violation might lead to casinos operating under secretarial procedures, rather than a tribal-state compact—a result that was not disclosed to the voters and is unlikely to have been understood by them. (See Raging Wire, supra, 42 Cal.4th at p. 930 [judicial constructions of voter initiatives that “have substantial unintended consequences” are not preferred].)